UNITED STATES *v.* ZELLERBACH PAPER CO. (HOYT, SHEPSTON & SCIARONI) (NO. 4313)[1]

United States Court of Customs and Patent Appeals, February 24, 1941

*Charles D. Lawrence*, Acting Assistant Attorney General (*Daniel I. Auster*, special attorney, of counsel) for the United States.
*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for appellee.

[Oral argument December 13, 1940, by Mr. Charles D. Lawrence; submitted on brief by appellee]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The Zellerbach Paper Co., hereinafter referred to as appellee, imported at the port of San Francisco, Calif., certain matrix board from Germany, the entries made covering a period from May 22, 1935, to February 4, 1938. The merchandise covered by the entries was appraised at unit prices of 80 and 90 pfennings per square meter,

---

[1] C. A. D. 159.

depending upon the thickness of the board, less a discount of 3 per centum and plus packing. Appellee appealed for reappraisement of the goods covered by each entry and the appeals were consolidated for the purpose of trial.

A number of contentions were made at the trial, but for the purposes of this case we need consider only the contention of appellee that an item of inland freight, consisting of the cost of shipping the merchandise from its places of manufacture to Hamburg or Bremen, the ports of exportation, should have been deducted from the invoice price to the importer in arriving at the appraised value thereof.

Some of the invoices of the merchandise here involved show that the sales were made f. o. b. Hamburg and some show sales f. o. b. Bremen. In 16 of the involved 18 reappraisements, the record shows that the merchandise was manufactured by A. & F. Schneider at their factories in Nebra/Unstrut or Freyburg/Unstrut, Germany, and in the other two reappraisements, the record shows that the merchandise was manufactured by Clemens Claus of Thalheim/Erzgeb, Germany. The places where the merchandise was manufactured are located near the eastern border of Germany, approximately 150 miles away from Bremen and Hamburg, which are ports where merchandise like that here involved is shipped for exportation. It is shown by the record that the sale of such merchandise is controlled by a trade group or association, the "Fachschaft" which requires that the producers of the involved matrix board sell it at certain unit prices per square meter, according to thickness.

The record consists of the testimony of four witnesses for the appellee and a number of exhibits, the two mainly relied on here being exhibits 3 and 6, reports of Treasury representatives relative to the sale of matrix board. Exhibit 3 covers sales by A. & F. Schneider and exhibit 6 covers sales of a different firm located at Halberstadt. Exhibit 3 was offered by the appellee; exhibit 6 by the Government, The record clearly shows sales of merchandise like that involved in the instant appeal to various purchasers in different towns or cities in Germany, which merchandise was sold for home consumption.

The single judge, sitting in reappraisement, held that the inland freight was not a part of the dutiable value of the involved merchandise. He stated:

As we read the special agent's report no closed market is shown, but instead, negotiated sales to a single importer who buys after negotiation which should be controlling. Therefore, in our view, the *per se* appraised value, which is the foreign value, should stand for all the matrix board, whatever the color.

However, the special agent's report shows plainly that the inland freight is deducted from the price and the packing is included in the price.

Therefore, all the matrix board is hereby appraised at the local appraiser's *per se* findings packed, less inland freight wherever invoiced, less 3 per centum discount.

The United States appealed from the judgment of the single judge, and the United States Customs Court, Second Division, sitting in appellate term, affirmed the said judgment, whereupon the United States has appealed here on the ground that there is no substantial evidence to support the judgment of the court below and that the appellate division committed reversible errors of law.

Aside from the question relating to the principal market in Germany for goods such as or similar to those at bar, there is no dispute about what facts the evidence discloses. There is spirited controversy relative to the conclusions of law which should be drawn from a consideration of the admitted facts. We have, therefore, submitted to us only an issue of law which we, under legislative mandate, are required to decide. See section 501, Tariff Act of 1930.

The involved merchandise was appraised and reappraised upon the basis of its foreign value and there is no contention that this is not the proper basis for valuation; the controversy revolves solely around the contention of the Government, on the one hand, that the inland freight forms part of that value and should not have been deducted from the selling price listed in the invoices, and the contention of the appellee, on the other hand, that the inland freight forms no part of the foreign value and that the judgment below was proper.

In support of its contention, the Government argues that the factories at either Nebra, Freyburg, or Thalheim must be regarded as the principal market; that neither Hamburg nor Bremen was the principal market, and that the *per se* unit list price was paid in full by any purchaser in Germany no matter where he was located. In other words, the Government contends that all the material evidence in the record establishes that matrix board is sold for home consumption at a *per se* unit price, and that the manufacturer either prepays the freight, it being implicitly included in the total amount based on the *per se* unit price, or ships the goods "freight collect," the amount of the freight to be deducted by the purchaser from the total amount based on the *per se* unit price.

The importer contends that in the record at bar there is no evidence that the principal markets—the places where the merchandise was sold—were the places where the factories were located, but that "either Berlin, Hamburg, or Bremen was the principal market." The argument is also made that since the merchandise was purchased for delivery at some place other than the place of manufacture, it follows that the manufacturer did not receive the full unit price in any transaction since the cost of inland freight was always deducted.

It is established by the two exhibits hereinbefore referred to that the seller always quotes the *per se* unit price regardless of where the buyer is located, and that the seller either prepays the freight, in which case no additional charge is made to the purchaser for it, the pur-

chaser paying a total amount based on the *per se* unit price, or the seller permits the purchaser to pay the freight to the carrier on delivery and then to deduct the amount thereof from the total amount based on the *per se* unit price of the merchandise. The following is quoted from exhibit 3:

(c) *Usual Terms of Inland Sale and Delivery.*—Deliveries to the local trade as stipulated by the cartel are understood to be "ex factory-station" with deduction made on the invoice for the actual freight expense incurred to buyer's inland destination. All packing charges are already included in the purchase price. If the goods are to be delivered direct to the consumer's premises, i. e. "free house," an amount of 2% of the invoice value is added. *In other words, the manufacturer assumes the cost of transportation from factory to buyer's station only.* [Italics except heading ours.]

The following is quoted from exhibit 6:

(c) *Usual Terms of Inland Delivery.*—Invoices covering domestic sales of matrix board, I found, almost invariably show that the merchandise was sold at the prevailing "Fachschaft" unit prices, with the cost of freight to buyer's destination being deducted in each case. The amount of freight, of course, varies depending upon the distance of the customer from the factory. The cost of packing, usually in bales, is invariably included in the selling price.

\*    \*    \*    \*    \*    \*    \*

In all cases the above-mentioned unit prices are subject to a cash discount in addition to the trade discounts shown, as already indicated under Subdivision "a," Foreign Value. Such quotations also include transportation charges to any customer's station, most shipments being sent "freight collect." The factory avoids advancing freight costs by allowing the amount in question which is deducted from the price of the merchandise shown on the commercial invoice.

It would seem to follow that every purchaser in Germany, no matter where he was located would, in buying the same quantity of a given thickness of matrix board, pay out exactly the same amount of money, based on the unit price. If the merchandise were shipped to him freight collect, the invoice rendered him by the seller would show a deduction for the amount of the freight, and the purchaser would thus be paying part of the total amount (based on the unit price) to the seller, and the remainder of it to the carrier. If the freight were prepaid, then the purchaser would remit the total amount (based on the same unit price) to the seller, the net result to the latter being that he would receive an amount (based on the unit price) diminished by the amount of the freight he had prepaid. For the same quantity of like merchandise, then, sold to two different purchasers, at different distances from the factory, the manufacturer would receive two different *net* amounts. The *gross* amount expended in each instance would be the same, as each purchaser would pay out the same sum of money for a like quantity of similar merchandise.

The examiner at the port of San Francisco testified that he appraised the involved merchandise at its foreign value. It is made clear by the record that this value included the inland freight to Bremen, which

was the port of exportation of some of the merchandise, or the inland freight to Hamburg, which was the port of exportation for other portions of the merchandise.

The parties to this litigation present but one issue for determination, to wit, was the proper dutiable value of the involved merchandise that found by the appraiser, which included the inland freight, or that claimed by the appellee, which is the appraised value less the inland freight.

Foreign value is defined in section 402 (c) of the Tariff Act of 1930 as follows:

SEC. 402. VALUE.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The Government contends that the importer has "failed to prove the principal market" and urges that it must be assumed, under the circumstances above related, that the places of manufacture were the principal markets of Germany for the imported merchandise. The evidence of record relating to sales of merchandise like that involved here in Germany for home consumption shows that such sales were all made at the places of manufacture, and, in the absence of proof to the contrary, we think it must be assumed that the principal markets in Germany for merchandise like that involved here, the sale of which was controlled by a trade association or cartel, were at the places of manufacture. Certainly there is nothing in the record which requires a holding that the cities of Hamburg or Bremen are the principal markets in Germany for such merchandise as is here involved.

It must first be observed that the statute requires that in determining foreign value of imported merchandise the appraiser is required to find "the market value or the price　\*　\*　\*　at which such or similar merchandise is freely offered for sale to all purchasers　\*　\*　\*　in the ordinary course of trade." It is clear that Congress contemplated that if there was a foreign value for merchandise imported into this country, it had to be "the price" for which such or similar merchandise was freely offered for sale and not several different *prices*.

We think that the decision in this case is largely controlled by our decision in *United States* v. *Heffernan Paper Co.*, 13 Ct. Cust. Appls. 593, T. D. 41454, the facts in which are very much on all fours with those involved in the decision of the issue at bar. It was there held, and subsequently followed in other decisions, that inland freight

from the place of manufacture to the port of embarkation was never deducted from the selling price unless it was necessary to do so in determining what was the actual selling price of such or similar merchandise in the country of exportation. It is also well settled by decisions of this court, based upon holdings by the Supreme Court of the United States, that for a given item of imported merchandise there cannot be, in the country of exportation, more than one market value. *United States* v. *Minkus*, 21 C. C. P. A. (Customs) 382, T. D. 46912; *United States* v. *Passavant*, 169 U. S. 16.

We think that upon the instant record it must be held that the only price at which merchandise like that at bar was freely offered for sale to all purchasers, in the ordinary course of trade in the country of exportation, on the date of exportation, was that which formed the basis of the appraiser's ascertainment of the dutiable value of the goods. This price was that which every purchaser in Germany was required to pay in order to obtain the goods.

While the facts relating to sales and offers for sale in Germany of merchandise like that involved here are not the subject matter of contention between the parties, it seems that some confusion and difficulty arise when necessary legal deductions must be drawn therefrom. To simplify the application of pertinent law to the facts hereinbefore recited, we think the exact question presented and the controlling principle of law involved might be better understood by the following illustration: Let us assume that a given amount of goods at the factory in eastern Germany cost $100 whether delivered there or shipped (freight being paid by the seller) 150 miles into western Germany. The purchaser at the distant point would pay $100. As a part of the $100 was freight, the seller would obtain $100 less the amount of the freight. If a purchaser lived at the place of manufacture where there was no charge for freight, he paid $100 and the seller obtained $100. If the purchaser lived at an intermediate point, he would pay $100, but since there were freight charges, the seller would obtain less than that obtained from the buyer at the place of manufacture and more than that obtained from the buyer who lived in western Germany. All purchasers, no matter where located, paid the same—$100. It is true that the seller did not obtain from each of the purchasers the same net amount of money, and right here is the crux of the case. The mandate of the statute does not provide that there shall be one price received by the seller, but that the price accepted as foreign value shall be that at which such or similar merchandise is freely offered to all purchasers.

. It is too obvious to permit of extended discussion that if the importer's contentions were sustained, there would be in Germany, on the date of exportation of the instant merchandise, numerous *prices*

for identical merchandise, one price to those living in Bremen and a higher price for those living at or near the place of manufacture. Surely, it cannot be logically contended that the foreign value for the imported merchandise is to be ascertained by deducting from the selling price the inland freight from the place of manufacture to the port of embarkation when purchasers at the place of manufacture and at intermediate points would be required to pay a greater sum. The appellee points out that if the inland freight is not deducted, it results in the manufacturer obtaining a less sum for goods shipped to Bremen than for those sold at the point of manufacture or at intermediate points. As we see it, this fact is immaterial. The controlling question is at what price are the goods freely offered for sale in accordance with the requirements of the statute. This question was present in the *Heffernan Paper Co.* case, *supra*. There the expenses to the manufacturer, which included freight, were under consideration and we held that the manufacturer must have "estimated, distributed and incorporated in the sales price" the expenses of delivery which included freight. We there said:

But assuming that Berlin was one of the principal markets of Germany at the time of export and that Hamburg was not, it became necessary for the appraiser, under the law, to find the price at which the goods imported were freely offered for sale at that time, in Berlin. When so found, that was the foreign value. The record shows plainly what this price was. It was 38.20 gold marks per 100 kgs., delivered. Whether the goods were delivered at Wismar, or Hamburg, or in Berlin itself, the price was 38.20 gold marks. Evidently the expenses of delivery, including freight, were estimated, distributed, and incorporated in the sales price and thus it resulted that the purchaser having goods delivered in Berlin upon which there were no freight charges, contributed to the expense of delivering similar goods to the customer at Wismar or Hamburg. It is a matter of common knowledge that much the same system is practiced by many of our mercantile retailing establishments in this country. But whether the goods are delivered at the expense of the seller or carried away by the purchaser, without expense, the price is the same.

We think that in the instant case the record clearly shows that the German manufacturer of goods like those imported puts all German purchasers on the same footing, regardless of the place to which the goods are to be shipped. All purchasers for home consumption were treated alike. No one, regardless of freight charges or other expenses, was at a disadvantage over others who dealt in the same goods in Germany. The mere fact that the manufacturer received less from a transaction with a distant buyer than from a transaction with one located at or near the factory makes no difference in determining "the price" which the appraiser was required to find. If the contentions of the importer and the decisions of the tribunals below are to be approved, it would necessarily follow that goods like those at bar, shipped from different ports of Germany on the same date would have different foreign values. If the freight rate to Hamburg from

the point of manufacture was greater than that to Bremen, the foreign value of the goods shipped from Hamburg would be one amount and that of those shipped from Bremen would be another. This result, of course, would be anomalous, and a holding to that effect would lead the appraising officers into utter confusion. Such a result could not possibly have been within the contemplation of the framers of the Tariff Act of 1930. This was substantially our holding in the *Heffernan Paper Co.* case, *supra*, where we said:

\* \* \* In the case at bar, however, if inland freight be allowed, the importer is given a dutiable value for his goods which is less than the price at which they can be bought, on the open market, in Berlin. Such a result, manifestly, was not in the mind of Congress when it enacted subsection (b) of section 402 [Tariff Act of 1922].

It must be remembered that we are not here concerned with export value or any other value except "foreign value" and there is no contention made here (appellee contended otherwise before the single judge sitting in reappraisement) by either party that any other value but the foreign value was the proper dutiable value for the appraiser to adopt as the basis of his appraisement.

The question raised with reference to the principal market of Germany need not be further considered or discussed, because in our view it is immaterial under the particular circumstances at bar. It is immaterial for the reason that no matter where the goods were shipped after having been sold, the purchaser at that point paid the same amount as did the purchaser at any other point in Germany; that is to say, the price was the same in all markets whether *principal* or not.

For the reasons hereinbefore stated, it follows that the decision of the United States Customs Court was erroneous. The judgment appealed from is *reversed*, and the cause is *remanded* for further proceedings not inconsistent with the views herein expressed.