**ZENITH ELECTRONICS CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

**INDEPENDENT RADIONIC WORKERS OF AMERICA, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Nos. 85–06–00788, 85–07–00905.

United States Court of
International Trade.

April 24, 1986.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson and J. Eric Nissley), for plaintiff Zenith Electronics Corp.

Collier, Shannon, Rill & Scott (Paul D. Cullen, Patrick B. Fazzone and Laurence J. Lasoff), for plaintiffs Independent Radionic Workers of America, et al.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Dir., Commercial Litigation Branch (Velta A. Melnbrencis), for defendant.

Weil, Gotshal & Manges (A. Paul Victor, Stuart M. Rosen, Charles H. Bayar and Michelle S. Benjamin), for defendant-intervenors Matsushita Elec. Indus. Co., et al.

Sharretts Paley Carter & Blauvelt, P.C (Gail T. Cumins and Neil H. Marshak), for

defendant-intervenors, Sanyo Elec. Co., Ltd.

Siegel Mandell & Davidson, P.C. (Brian S. Goldstein and Edward B. Ackerman), for defendant-intervenor The General Corp. of Japan.

Baker & McKenzie (Thomas P. Ondeck and Arthur L. George), for Mitsubishi Elec. Corp. and Mitsubishi Elec. Sales America, Inc.

## MEMORANDUM OPINION AND ORDER

WATSON, Judge:

These consolidated actions are brought by Zenith Electronics Corporation ("Zenith"), an American manufacturer of television sets, and by three unions [1] representing American workers engaged in television manufacturing, contesting the final determination of the United States Department of Commerce, International Trade Administration ("ITA"), in *Television Receiving Sets, Monochrome and Color, From Japan,* 50 Fed.Reg. 24278 (June 10, 1985). The determination stems from an administrative review of an antidumping finding, conducted pursuant to 19 U.S.C. § 1675(a), covering television sets exported to the United States by 16 Japanese manufacturers and/or exporters between April 1, 1980 and March 31, 1981. The ITA, in all cases, concluded either that there was no dumping or that the dumping margins were *de minimis* or small (not exceeding 0.86% *ad valorem* weighted average margin).

Presently before the court are motions by Zenith for judgment upon the agency record in case No. 85–06–00788,[2] and by the Unions for partial judgment upon the agen-

---

1. The plaintiff unions are The Independent Radionic Workers of America, The International Brotherhood of Electrical Workers, and The International Union of Electronics, Electrical, Technical, Salaried and Machine Workers, AFL–CIO–CLC. They are collectively referred to herein as "the Unions".

2. Zenith's motion, made pursuant to Rule 56.1 of this court, was originally a motion for partial judgment. Zenith has since abandoned its remaining challenges, which involved issues decided adversely to Zenith in *Zenith Radio Corp. v. United States,* 9 CIT ——, 606 F.Supp. 695 (1985), *aff'd,* 783 F.2d 184 (Fed.Cir.1986). *See* letter to court from counsel for Zenith, dated February 12, 1986.

cy record in case No. 85–07–00905.[3] The two motions involve identical challenges to the method by which the ITA calculated the adjustment for the Japanese commodity tax under 19 U.S.C. § 1677a(d)(1)(C). Zenith and the Unions contend that the ITA violated the requirements of that provision by (1) reducing foreign market value by the amount of commodity tax assessed on home market sales, rather than increasing United States price by the amount of tax forgiven on exports to the United States, and (2) assuming a full pass-through of the commodity tax to customers in home market sales, rather than determining the extent to which the tax was included in home market price so as to limit the commodity tax adjustment to that amount.

The defendant, United States, opposes plaintiffs' motions, but has filed cross-motions for remand in both cases. The defendant requests that the ITA be permitted on remand (1) to seek information concerning the appropriate commodity tax base for the exported merchandise, and (2) to reconsider the pass-through issue in light of its subsequent determination in *Grand and Upright Pianos From the Republic of Korea,* 50 Fed.Reg. 37561 (Sept. 16, 1985). Alternatively, the government asks the court to hold that no pass-through analysis is required under § 1677a(d)(1)(C).

Two additional opposing positions are taken by intervening defendants representing Japanese exporting interests. The Mitsubishi company-intervenors[4] ("Mitsubishi") seek remand but would require the ITA to make an upward adjustment to United States price either in the amount of tax collected on comparison home market sales, or in the amount of tax forgiven on exports coupled with an additional circumstances of sale adjustment to home market price. Several other Japanese interest intervenors[5] (collectively referred to as "Matsushita *et al.*" or "joint intervenors") jointly contend that the adjustment performed by the ITA was within its discretion and should be affirmed either as a reasonable method of performing the tax adjustment under § 1677a(d)(1)(C) or as a circumstances of sale adjustment required under 19 U.S.C. § 1677b(a)(4)(B). Both Mitsubishi and Matsushita *et al.* contend that § 1677a(d)(1)(C) does not require the ITA to make a pass-through determination.

## Background

Under the antidumping law, dumping margins for sales of imported merchandise are calculated by comparing determinations of foreign market value ("FMV") and United States price ("USP"). 19 U.S.C. § 1673. Where merchandise identical or similar to the imported merchandise is sold in the home market of the exporting country, FMV is determined from the home market price of that merchandise, pursuant to 19 U.S.C. § 1677b(a)(1)(A). In the absence of such sales, FMV may be determined from a price method using export sales to countries other than the United States, pursuant to 19 U.S.C. § 1677b(a)(1)(B), or a non-price method known as constructed value, pursuant to 19 U.S.C. § 1677b(a)(2) and (e). Determinations of USP are based upon the import "purchase price", as defined in 19 U.S.C. § 1677a(b), or if the first sale to an unrelated American purchaser occurred in the United States, upon the "exporter's

---

**3.** The Unions have raised two claims in their complaint which are not covered by their Rule 56.1 motion. The first, contesting foreign market value adjustments for certain discounts and rebates, was resolved adversely to the Unions in *Zenith Radio Corp. v. United States, supra.* The second claim challenges the ITA's use of weighted average margins. Because the parties have not briefed this issue, the court will reserve determination thereon.

**4.** The Mitsubishi intervenors consist of Mitsubishi Electric Corporation and Mitsubishi Electric Sales America, Inc.

**5.** The joint intervenors are comprised of Matsushita Electric Industrial Co., Ltd., Panasonic Company and Quasar Company (divisions of Matsushita Electric Corporation of America), Panasonic Hawaii, Inc. and Panasonic Sales Company (a division of Matsushita Electric of Puerto Rico, Inc.); Victor Company of Japan, Ltd. and US JVC Corp.; Sanyo Electric Co., Ltd.; and The General Corporation of Japan.

sales price", as defined in 19 U.S.C. § 1677a(c). To these price or value determinations, various upward and downward adjustments are made pursuant to statutory provisions and Commerce Department regulations to arrive at determinations of FMV and USP. The "absolute dumping margin" for a sale is the amount, if any, by which FMV exceeds USP. Absolute margins are calculated for the assessment of antidumping duties. The *"ad valorem* (or percentage) margin" for a sale is the ratio of the absolute margin over the USP. The *"ad valorem* weighted average margin" for sales during the period under investigation or review is the total amount of absolute margins on individual sales divided by the total USP for all entries. *See* 19 U.S.C. § 1677b(f) (1982) (authorizing use of averaging or sampling for determinations of FMV). The ITA calculates *ad valorem* margins for purposes of issuing and revoking orders and setting cash deposit rates. *See* 50 Fed.Reg. at 24279.

The antidumping law contemplates that the unadjusted price determinations by the ITA are "after-foreign-tax prices", in the sense that they are measured after the producing country has assessed indirect taxes tied to the manufacture or sale of the merchandise in question. One such tax is the Japanese Commodity Tax, an *ad valorem* tax which Japan imposes on many types of products, including television receivers. For televisions with screen sizes under 27 inches, the commodity tax rate is 15% of the manufacturer's exfactory sales price, based either on actual wholesale price or suggested retail price less a standard deduction. Commodity Tax Law of Japan (13 March 1962, Law No. 48), as amended, Arts. 11, 13. Like most countries that impose excise or consumption taxes on goods, Japan assesses the commodity tax on sales for domestic consumption, but does not collect the tax on export sales. *Id.*, Arts. 19, 21.

To prevent dumping margins from arising merely because the country of exportation assesses such taxes on home market sales but not on export sales, the antidumping law provides for an offsetting adjustment in the calculation of United States price. The provision, 19 U.S.C. § 1677a(d)(1)(C) (1982), states:

> The purchase price and the exporter's sales price shall be adjusted by being ... increased by ... the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in a country of exportation.

This adjustment, by its terms, has two components. First, USP—whether determined by purchase price or exporter's sales price—is to be increased by the amount of foreign taxes imposed directly upon the exported merchandise or its components, which have been forgiven (rebated or not collected) because the merchandise was exported to the United States. Second, the adjustment is to be limited or "capped" by the amount that such taxes are added to or included in the price of comparison merchandise sold in the home market.

### ITA Proceedings

In its preliminary results and tentative determination, published August 18, 1983 (48 Fed.Reg. 37506, 37508), the ITA indicated that it computed the FMV of most Japanese television models under review based upon the delivered price of such merchandise to customers in the home market, in accordance with 19 U.S.C. § 1677b(a)(1)(A).[6] Its determinations of USP were based upon "purchase price" or, where appropriate, "exporter's sales price", pursuant to 19 U.S.C. § 1677a(b) and (c). Among the adjustments made to USP was

---

**6.** In certain cases where there were insufficient comparison sales in the home market, the ITA computed FMV based upon the price of exports to Canada, pursuant to 19 U.S.C. § 1677b(a)(1)(B), or upon the constructed value of the exported merchandise, pursuant to 19 U.S.C. § 1677b(a)(2).

the foreign tax adjustment under 19 U.S.C. § 1677a(d)(1)(C). The ITA stated that in all cases, it calculated an addition to purchase price or exporter's sales price "for the amount of Japanese commodity tax not collected because of the exportation of the merchandise to the United States." *Id.* at 37507. It was later disclosed, however, that the ITA in fact did not add to USP the amount of tax forgiven on export merchandise, but instead added the full amount of the tax paid on comparison home market sales.[7] Because the Japanese commodity tax is an *ad valorem* tax (imposed as a percentage of price), these two amounts would not be the same unless the tax-free prices of exported and domestically sold merchandise were the same. Where the United States export price is less than the non-taxed home market price, the addition to USP under the ITA's approach would be greater than that called for by the terms of § 1677a(d)(1)(C).

In its final determination, published June 10, 1985 (50 Fed.Reg. 24278), the ITA again adjusted for the full amount of commodity tax paid on comparison sales in Japan, but this time instead of adding that amount to the purchase price or exporter's sales price in its determinations of USP, the ITA subtracted that amount from the home market price in its determinations of FMV.[8] The ITA agreed with Zenith and the Unions, petitioners below, that this methodology conflicts with the directives of § 1677a(d)(1)(C) and was specifically rejected by Congress when it enacted the 1921 Antidumping Act. The agency's explanation for nevertheless having taken this approach was two-fold. First, it noted that in cases where a dumping margin would exist in the absence of taxes, the statutory approach artificially increases (or "multiplies") the absolute dumping margin.[9] Conversely, the method employed in the agency's preliminary findings (i.e., adding to USP the tax paid on home market sales), in such cases, artifically suppresses *ad valorem* (or percentage) margins.[10] The ITA

---

**7.** The ITA acknowledged the actual methodology used in the preliminary results in the recitation of comments to the final determination, at comment 1:

> Zenith and the Unions argue that the Department erred when, in its preliminary results of administrative review, it added to United States price the commodity tax imposed on the home market merchandise. They contend that [19 U.S.C. § 1677a(d)(1)(C) ] clearly directs the Department to add to U.S. price the tax amount that would have been imposed had it been sold in Japan.

50 Fed.Reg. at 24278. *See also Color Television Receivers From Korea,* 49 Fed.Reg. 7620, 7622 (Mar. 1, 1984) (comment 1).

**8.** The ITA had also employed this approach in three interim determinations, involving television receivers from Korea and Taiwan. *Color Television Receivers From Korea ("Korean Televisions I"),* 49 Fed.Reg. 7620 (Mar. 1, 1984) (final determination of sales at less than fair value); *Color Television Receivers From Taiwan ("Taiwan Televisions"),* 49 Fed.Reg. 7628 (Mar. 1, 1984) (final determination of sales at less than fair value); *Color Television Receivers From Korea ("Korean Televisions II"),* 49 Fed. Reg. 50420 (Dec. 28, 1984) (final results of administrative review of antidumping duty order).

**9.** This "multiplier" effect can be illustrated in the following example: Suppose the pre-tax home market price for a certain model of Japanese television is equal to $100, while the purchase price for the same model when sold for export to the United States is $90. In this tax-free comparison, the absolute margin of dumping would be $10 ($100–$90) and the *ad valorem* margin would be 11.1% ($10/$90).

Since the Japanese commodity tax is 15%, the tax on the home market sale equals $15 (15% of $100). If we assume that this tax is fully shifted forward to the home market purchaser, then the after-tax home market price equals $115. By contrast, the amount of tax rebated or not collected on the exported television because it was sold for export would equal only $13.50 (15% of $90). Hence, if the United States price were increased by this latter amount, in accordance with the terms of 19 U.S.C. § 1677a(d)(1)(C), the adjusted calculation of USP would be $103.50 ($90 + $13.50). The absolute margin, determined by subtracting the adjusted USP from the after-tax home market price, would be $11.50 ($115–$103.50), an amount greater than the $10 absolute margin calculated in the tax-free comparison, above. The *ad valorem* margin, however, would be identical, at 11.1% ($11.50/$103.50).

**10.** Continuing the example in footnote 9, if the United States price of the television were increased by the amount of Japanese commodity tax actually collected on the home market sale, as the ITA did in its preliminary determination, the adjusted USP would be $105 ($90 + $15).

believed that the margin distortions caused by either method were further increased by significant differences in the circumstances of sale and the physical characteristics of the merchandise. Only by deducting from FMV the amount of commodity tax paid on home market sales, as the ITA did in its final determination, is pure tax neutrality achieved in calculations of both absolute and *ad valorem* margins.[11] Second, the ITA claimed it was unable to establish from the information it obtained "what the appropriate tax basis would be for the exported merchandise and exactly how the Japanese taxing authority would calculate the amount of tax on exported merchandise." It therefore felt that the deduction of home market taxes from FMV was "a reasonable alternative calculation ... based on the best available information." *Id.* at 24279.

The ITA further acknowledged that the "cap" provision in § 1677a(d)(1)(C) directs the agency to measure the degree to which a seller absorbs the tax in home market sales, and to limit the adjustment to the amount of tax shifted forward to purchasers. The petitioners below emphasized that several Japanese manufacturers granted various after-invoice discounts, rebates or other allowances to home market purchasers, which, because they were not certain at the time of sale, did not reduce the commodity tax base. Zenith argued that the amount by which a manufacturer's commodity tax value plus commodity tax exceeded the manufacturer's home market sales price reported to the ITA represents the amount of the commodity tax not passed on to the purchasers. The ITA rejected Zenith's approach and, in effect, merely assumed a full pass-through of the commodity tax, stating:

Discounts and rebates may be provided for a number of reasons, and we have no evidence of a relationship between the discounts and rebates and the manufacturer's commodity tax liability. Absent evidence that clearly demonstrates that a manufacturer's commodity tax cost is not reflected in home market sales prices, the Department may reasonably conclude that cost and price are directly related. To date, the Department has not developed a reasonable method for isolating the cost-price relationship for individual adjustments.

*Id.*

In a subsequent determination in *Grand and Upright Pianos From the Republic of Korea* ("*Korean Pianos*"), 50 Fed.Reg. 37561 (Sept. 16, 1985), the ITA declared that its previous interpretation of § 1677a(d)(1)(C) to require the measurement of tax absorption in home market sales was incorrect. The ITA now concluded that Congress inserted the "pass-through" clause in § 1677a(d)(1)(C), as part of the Trade Act of 1974, to accommodate the effect possible future treaties or judicial decisions might have on the standards employed by the Treasury Department in administering the countervailing duty law, for the purpose of ensuring "harmonized tax treatment" between the Antidumping Act and the countervailing duty law. Because Treasury's practice of not regarding as an unfair subsidy the non-excessive rebate of final stage indirect taxes (such as the Japanese commodity tax) has since been upheld, the pass-through clause should be read as simply applying to the antidumping law the underlying assumption that final stage indirect taxes are fully shifted forward. *Id.* at 37562–65. The ITA further felt that to interpret § 1677a(d)(1)(C) otherwise would produce conflict with the complementary purpose of 19 U.S.C. § 1677a(d)(1)(D) in a combined

Under this approach, the absolute margin would be equivalent to the margin found in the tax-free comparison, $10 ($115–$105), but the *ad valorem* margin would be reduced to 9.5% ($10/$105).

11. Again using the example in footnote 9, if the home market price were reduced by the amount of the tax on the domestic sale, as the ITA did in its final determination, the adjusted home market price would be $100 ($115–$15). The absolute and *ad valorem* margins, therefore, would be equivalent to their respective levels in the tax-free comparison, *i.e.*, $10 ($100–$90) and 11.1% ($10/$90).

countervailing duty and antidumping case. *Id.* at 37565. Finally, the ITA compared differences in final stage tax liability to differences in material costs or credit expenses, and stated that it perceived "no economic justification for adjusting the home market-U.S. price differential by anything less than the actual amount of final stage taxes paid by the producers." [12] *Id.*

### Standard of Review

Plaintiffs having brought these actions pursuant to 19 U.S.C. § 1516a(a)(2), the applicable standard of review is whether the challenged determination by the ITA is supported by substantial evidence on the record and is otherwise in accordance with the law.[13] 19 U.S.C. § 1516a(b)(1)(B).

### Adjustment to Foreign Market Value

The ITA correctly acknowledged that the offsetting adjustment for the forgiveness of Japanese commodity taxes on merchandise exported to the United States is governed by 19 U.S.C. § 1677a(d)(1)(C).[14] Hence, the first issue before the court is whether the ITA unlawfully departed from the requirements of that provision by subtracting from FMV the amount of commodity tax collected on home market merchandise [15] (irrespective of the "pass-through" issue, considered below).

**12.** The ITA stated in *Korean Pianos* that it adjusted USP "for indirect taxes imposed upon home market merchandise which have not been collected upon exported merchandise by reason of its exportation to the United States." 50 Fed.Reg. at 37561. This language and the language quoted above would seem to indicate that the ITA's adjustment to USP, purportedly made pursuant to § 1677a(d)(1)(C), was not for the amount of tax rebated or not collected on the exported merchandise, but was rather for the amount of tax actually collected on home market merchandise—in other words, that the ITA employed the methodology it used in the preliminary determination in this case.

**13.** The court rejects the government's suggestion in its motions for remand that the court should simply order a remand to the ITA without deciding the legal issues raised in plaintiffs' Rule 56.1 motions.

**14.** Joint intervenors, Matsushita *et al.*, contend that, notwithstanding the ITA's stated rationale, 19 U.S.C. § 1677a(d)(1)(C), by its terms, applies only to taxes "imposed by the country of exportation directly upon the exported merchandise", whereas Japan does not "impose" the commodity tax on exported merchandise, but "exempts" such merchandise from tax treatment. Hence, the intervenors argue, the ITA's adjustment to FMV for the tax collected on home market sales should be sustained as a circumstances of sale adjustment required under 19 U.S.C. § 1677b(a)(4)(B).

Congress clearly could not have intended an interpretation of § 1677a(d)(1)(C) along the lines advanced by Matsushita *et al.* At best, such an interpretation would frustrate the purpose of the adjustment by making its application turn not on whether the exported merchandise was selectively not taxed by the exporting country, but on how that country has *characterized* the non-taxation. At worst, it would make the provision an absurdity by demanding that

the foreign tax for which the adjustment is made be "assessed" or "collected" on the exported merchandise, even though the adjustment expressly applies where taxes "have not been collected by reason of the exportation of the merchandise." It is evident that the "imposed" language merely signifies that the tax must be imposed on the *class or kind* of merchandise that has been exported. Thus, for example, if the Japanese commodity tax were not imposed on television receiving sets, no commodity tax adjustment would be made for Japanese televisions exported to the United States. *Cf. Lewyt Corp. v. Commissioner of Internal Revenue*, 349 U.S. 237, 240, 75 S.Ct. 736, 739, 99 L.Ed. 1029 (1954) (comparable interpretation of "imposed" in similar statutory context); *In re Robbins' Estate*, 258 Wis. 206, 47 N.W.2d 889, 890 (1951) (same).

**15.** The government argues that regardless of whether the ITA's use of this methodology was lawful, it did not materially prejudice the interests of the complainants. This argument is difficult to reconcile with the government's request for a remand of this issue. In any case, the government is mistaken. The illustration presented in the government's brief in opposition to the Unions' motion (at page 18, note 6) assumes that an adjustment which increases USP would be in the *same amount* as the ITA's adjustment which decreased FMV by the tax assessed on home market sales. Obviously, if this were the case, absolute margin levels would be unchanged and *ad valorem* margins would actually be reduced. However, because the illustration also assumes that the exported merchandise is being dumped (*i.e.*, sold at a lower price than the taxable home market price), the respective adjustments would *not* be in the same amounts unless (a) the foreign tax were a "unit" or "flat-rate" tax (which is not true of the Japanese commodity tax on televisions), or (b) the upward adjustment to USP were in the amount of the tax collected on home market sales rather

While it has been said that a reviewing court should give "tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law", *Smith-Corona Group v. United States*, 713 F.2d 1568, 1582 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984), such deference must be restricted to issues left open by the statutes themselves. As the Supreme Court recently stated:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intents.... If a court, employing traditional rules of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44 n. 9, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984) (citations omitted). *Accord Board of Governors of the Federal Reserve System v. Dimension Financial Corporation*, —— U.S. ——, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986) ("The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress."); *Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979).

The language of 19 U.S.C. § 1677a(d)(1)(C) clearly and unambiguously delineates the adjustment to be performed by the Commerce Department. Specifically, the provision calls for an upward adjustment to USP (rather than a downward adjustment to FMV) in the amount of tax that would have been assessed on the exported merchandise had it been sold in the home market (rather than the amount of tax actually assessed on merchandise sold in the home market). While the final clause of the provision sets a "cap" on the amount of the adjustment, the statute gives no indication that the ITA has discretion to employ alternative methods of performing the adjustment.

The pertinent legislative history of this provision uniformly echoes Congress' unmistakable intent that the adjustment be an increase to the USP in the amount of tax rebated or not collected on the exported merchandise. *See S.Rep. No. 16*, 67th Cong., 1st Sess. 11–12 (1921); *H.R.Rep. No. 571*, 93d Cong., 1st Sess. 69–70 (1973); *S.Rep. No. 249*, 96th Cong., 1st Sess. 93–94 (1979), U.S.Code Cong. & Admin.News, 1979, p. 381; *H.R.Rep. No. 317*, 96th Cong., 1st Sess. 75 (1979). Moreover, as the ITA acknowledged, when the provision was first enacted as part of the Antidumping Act of 1921, Congress specifically considered and rejected the method of adjustment used in the ITA's final determination in this case.

Like the ITA's approach, antidumping legislation originally proposed in the House of Representatives had provided that the measure of FMV (referred to as "foreign home value") was *not* to include any excise taxes levied on merchandise sold in the foreign home market. *See Hearings on Anti-dumping Legislation Before the House Committee on Ways and Means*, 66th Cong., 1st Sess. 6 (1919). Customs officials strongly criticized this proposal as difficult to administer, and urged Congress to adopt a definition of FMV that would include such taxes and would thus correspond to "actual market value" used in both the Customs Administrative Act of 1890 and the Tariff Act of 1913 in the context of normal customs valuation for

than the amount forgiven on export sales (which plaintiffs contend the ITA may not do). *See* note 10, *ante*. If the statutorily required adjustment is an addition to USP in the amount of the commodity tax forgiven on exports, as plaintiffs contend, then in instances where dumping would be found in the absence of taxes, that amount would be less than the

amount by which the ITA decreased FMV in its final determination. The absolute margins in those instances would be increased. Because *ad valorem* margins would not change, only instances where the ITA previously found non-*de minimis* margins would be affected (assuming plaintiffs were to prevail solely on this issue).

assessment of ordinary duties. *Id.* at 14–19. *See generally United States v. Passavant*, 169 U.S. 16, 18 S.Ct. 219, 42 L.Ed. 644 (1898). The House, nevertheless, adopted bills in 1919 and 1921 which defined FMV to exclude foreign excise taxes. *See* 59 Cong.Rec. 327, 351 (1919); 61 Cong. Rec. 254 (1921). The Senate Finance Committee, however, redrafted the House proposals and specifically rejected the House definition of FMV. The Senate committee instead defined FMV, consistent with ordinary dutiable value, to include taxes imposed on merchandise sold in the foreign home market. *See S.Rep. No. 510*, 66th Cong., 2d Sess. 2 (1920); *S.Rep. No. 16*, 67th Cong., 1st Sess. 2 (1921). In addition, to prevent dumping margins from arising due to the forgiveness of such taxes on exports, the final Senate version provided for an upward adjustment to USP ("purchase price" and "exporter's sales price") in

> the amount of any taxes imposed in the country of exportation upon the manufacturer, producer, or seller, in respect to the manufacture, production or sale of the merchandise, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States.

*Id.* These provisions of the Senate proposal survived the House-Senate conference unchanged and were passed into law with the enactment of the Emergency Tariff Act of 1921, Title II of which was the Antidumping Act of 1921. Sections 203, 204, 42 Stat. 12, 13 (1921). Although Congress enacted limitations to the adjustment in the Trade Act of 1974 (discussed below), the basic structure has remained unchanged.

The ITA, therefore, departed from the clear requirements of the statute (a) in its final determination, by making the adjust-

ment a decrease to FMV rather than an increase to USP, and (b) in both its preliminary and final determinations, by adjusting for the amount of tax actually assessed on home market merchandise rather than the amount of tax which would have been assessed on the merchandise exported to the United States had it been sold in the home market.

These departures by the ITA cannot be justified by reference to past administrative interpretation of § 1677a(d)(1)(C). Most significantly, the ITA has denied that a consistent methodology for calculating the adjustment has been employed in past determinations. *Korean Televisions I*, 49 Fed.Reg. at 7623; *Taiwan Televisions*, 49 Fed.Reg. at 7631. In any event, such a justification is not possible in situations where, as here, the agency acknowledges that its approach conflicts with the approach intended by Congress. 50 Fed.Reg. at 24279. *See also Korean Televisions I*, 49 Fed.Reg. at 7623; *Taiwan Televisions*, 49 Fed.Reg. at 7631; *Korean Televisions II*, 49 Fed.Reg. at 50421. Furthermore, because the applicable Commerce Department regulation, 19 C.F.R. § 353.10(d)(1)(iii) [16], tracks the language of 19 U.S.C. § 1677a(d)(1)(C) almost *verbatim*, the court must conclude that the ITA's methodology in this case conflicts with the directives of that regulation, by the agency's own interpretation.

Intervening defendants, Matsushita *et al.*, seek to justify the ITA's approach by reference to what the ITA concluded is the fundamental purpose of the adjustment: to achieve a comparison of United States and foreign prices for the merchandise which is "tax neutral." The joint intervenors argue that the ITA's procedure of reducing FMV by the amount of the commodity tax imposed on home market sales was reason-

---

**16.** 19 C.F.R. § 353.10(d)(1)(iii) (1981) provides: Purchase price and exporter's sales price shall be adjusted by being—
(1) Increased by:

    \*    \*    \*    \*    \*    \*

    (iii) The amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof,

which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.

able and appropriate because it achieved the goal of tax neutrality better than the statutory adjustment to USP, and was based on information more readily obtained and verified. The intervenors further argue that if the ITA had adhered to the statute and increased USP by an amount estimated to be the tax forgiven on the exported merchandise, the agency would then have been required, in cases where that amount was less than the tax collected on home market sales, to make an additional "circumstances of sale" adjustment to FMV in the amount of the difference, pursuant to 19 U.S.C. § 1677b(a)(4)(B). Although the government, unlike Matsushita et al., requests a remand rather than affirmance, it defends the ITA's position that the adjustment in § 1677a(d)(1)(C) was intended to achieve pure tax neutrality. The government suggests that if the ITA determines on remand that it is unable to obtain "satisfactory information" regarding the Japanese commodity tax base, the agency would be justified in employing a non-statutory methodology such as it employed in the prior determinations.

Even if the defendants' resort to the "fundamental purpose" of the legislation were availing in the face of the clear statutory directive, the court is unpersuaded that Congress did not intend the adjustment in § 1677a(d)(1)(C) to operate as it does. When Congress rejected the 1919 and 1921 House proposals to exclude foreign excise taxes from FMV in favor of the statutory adjustment to USP (discussed at 1389–1390, ante), it surely could have

seen from simple calculations (such as those performed by the court in notes 1386–1387, ante) that the rejected approach would achieve a tax neutral comparison in all cases, whereas the enacted approach is (purely) tax neutral only in cases where there is no pre-tax dumping.[17] The comments of the Senate Finance Committee, which drafted the enacted provision, on the operation of the adjustment were as follows:

> In order that ... any excise tax which is refunded or not collected upon the exportation of the merchandise shall not constitute dumping, it is necessary also to add such items to the purchase price.
>
> \* \* \* \* \* \*
>
> In order that ... any excise tax which is refunded or not collected upon the exportation of the merchandise shall not constitute dumping, the term "exporter's sales price" is defined to include such items.

S.Rep. No. 16, 67th Cong., 1st Sess. 12 (1921). These comments express the concern that dumping margins not arise solely because the exported merchandise is exempted from foreign taxation, which the statutory adjustment achieves. They do not show that Congress intended the adjustment to be purely tax neutral in cases where dumping is otherwise found to occur. Furthermore, in a 1957 report on the operation and effectiveness of the Antidumping Act, the Secretary of the Treasury specifically informed Congress that the statutory approach achieves tax neutrality only where there is no dumping.[18]

---

17. The ITA seems to imply that Congress chose the latter approach only because Customs officials complained that the subtraction of foreign taxes from FMV was administratively "infeasible." See 50 Fed.Reg. at 24279. Such complaints, however, were obviously directed against any adjustment to offset foreign taxes; for the difficulties attendant with the subtraction from the home market price of foreign taxes actually paid would a fortiori be encountered in an adjustment which adds rebated or uncollected foreign taxes to purchase price and exporter's sales price.

18. The relevant remarks in the Secretary's report were as follows:

> [A]llowance shall be made, in calculating price to the United States market, for import duties or internal taxes, such as sales taxes, which are remitted by the country of export. In each case the amount remitted is added to the price to the United States market; and in calculating the home-consumption price the export duty or internal tax will similarly be included. To the extent that the figures are the same, and ordinarily they will not differ materially—they will cancel out.

"Report of the Secretary of the Treasury to the Congress on the Operation and Effectiveness of the Antidumping Act and Amendments to the Act Considered Desirable or Necessary," in Hearings on Amendments to the Antidumping

Although the report proposed several statutory revisions, which became the source of the 1958 amendments to the Antidumping Act (including the "circumstances of sale" adjustment emphasized by the intervenors), the report did not recommend that the tax adjustment provision be revised; nor did it suggest that Treasury was dissatisfied with the provision's operation.[19]

To properly evaluate the operation of the USP adjustment in § 1677a(d)(1)(C), attention must be given not only to the administrative concern of achieving fair price comparisons, but also to the fundamental aim of the antidumping law to eliminate injurious less than fair value sales of merchandise exported to the United States. As previously noted, the statutory adjustment does achieve tax neutrality with respect to ad valorem margins, but operates to increase absolute margins in cases where dumping margins would be present in the absence of taxes. The amount of the increase is proportional to the size of the pre-tax dumping margin. Any "unfairness" to a foreign producer resulting from the statutory adjustment, therefore, is the direct outgrowth of that producer's injurious less than fair value pricing. Rather than pursue such practices and face the assessment of proportionally increased antidumping duties, the producer can avoid the duties by simply adjusting its prices (raising United States price or lowering home market price) to eliminate the pre-tax dumping margins. Because the adjustment is tax neutral when the pre-tax home market price does not exceed the United States price, the statute provides an incentive, not present in the ITA's approach, for foreign producers to discontinue injurious dumping.

As the Supreme Court recently emphasized,

> The "plain purpose" of legislation ... is determined in the first instance with reference to the plain language of the statute itself.... Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action.

*Board of Governors v. Dimension Financial Corporation,* 106 S.Ct. at 688–89 (citation omitted). The methodology plainly commanded by § 1677a(d)(1)(C) embodies the degree of tax neutrality Congress sought to implement and may not be disregarded by the ITA on the ground that some other method would produce a "fairer" comparison, *see id.; Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980), or would be more "reasonable" or "efficient". *See United States v. H. Rosenthal Co.,* 609 F.2d 999, 1001–02 (C.C.P.A.1979). Only Congress, not Commerce, may effect such a revision.

The intervenors' contention that the ITA's adherence to the terms of § 1677a(d)(1)(C) would necessitate an additional "circumstances of sale" adjustment under 19 U.S.C. § 1677b(a)(4)(B)[20] to re-

---

Act of 1921, As Amended Before the House Committee on Ways and Means, 85th Cong., 1st Sess. 13 (1957) (emphasis added). The report was submitted to Congress as required by section 5 of the Customs Simplification Act of 1956. 70 Stat. 943, 948 (1956).

**19.** In support of their contention that the statute is intended to achieve pure tax neutrality, the government and Matsushita *et al.* rely primarily on remarks made by William L. Gifford, Assistant Secretary of Treasury for Legislative Affairs, in a letter of June 3, 1973 to John M. Martin, Chief Counsel of the House Ways and Means Committee. Mr. Gifford therein stressed that "the failure to add such tax to the price of the merchandise to the United States price, if it is rebated or remitted upon exportation, would distort any price comparisons and unfairly cre-

ate or increase the size of dumping margins." *Hearings Before the House Committee on Ways and Means on H.R. 6767,* 93d Cong., 1st Sess. 2395 (1973). This remark was not directed to the issue of tax neutrality, but was made in response to a proposal which would have completely eliminated the adjustment to USP for remitted taxes while continuing to include the amount of such taxes in home market price. The administration, understandably, was concerned that such a proposal would *unfairly* create or increase margins of dumping.

**20.** 19 U.S.C. § 1677b(a)(4)(B) (1982) provides: In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the

duce margins to their pre-tax levels is without merit. The antidumping law does not support the proposition that a tax differential generated by actual dumping constitutes an adjustable difference in the circumstances of sale under § 1677b(a)(4)(B). Such a construction would defeat the fair-value-pricing incentive inherent in the operation of § 1677a(d)(1)(C), the provision specifically addressed to the adjustment for remitted taxes. It would also defeat the tax-neutrality of § 1677a(d)(1)(C) with respect to *ad valorem* margins, by artificially *suppressing* such margins in cases where dumping is present.[21] Nothing in the language or legislative history of § 1677b(a)(4)(B) indicates that Congress intended such a result—even though, as noted above, the report of the Secretary of the Treasury which proposed the circumstances of sale adjustment also observed that the foreign tax adjustment to USP is tax neutral only in the absence of pre-tax dumping margins. The congressional reports to the 1958 amendments only cite such items as "differences in the terms of sale, credit terms, and advertising and selling costs" as examples of adjustable differences in the circumstances of sale. *S.Rep. No. 1619*, 85th Cong., 2d Sess. 7 (1958); *H.R.Rep. No. 1261*, 85th Cong., 1st Sess. 7 (1957). The applicable ITA regulation, 19 C.F.R. § 353.15, likewise, lists these sorts of examples but makes no mention of the adjustment serving to offset margin increases arising from the operation of § 1677a(d)(1)(C). Clearly, there is no basis for the circumstances of sale adjustment advocated by the intervenors.[22]

Finally, the failure of the ITA to perform the adjustment to USP in accordance with

§ 1677a(d)(1)(C), by adding the uncollected commodity tax to purchase price and exporter's sales price, cannot be excused on the ground that the agency was unable to determine what the amount of the tax would be. Such an explanation is patently untenable, particularly where the foreign tax is simply an *ad valorem* tax calculated upon a statutorily defined price-base.

Article 11 of the Japanese Commodity Tax Law provides that the tax base for Class 2 commodities (which includes television sets) is an amount equal to the manufacturer's freely-offered wholesale price at the time of shipment from the factory. Hence, as this court observed in *Zenith Radio Corp. v. United States*, 9 CIT ——, 606 F.Supp. 695, 698 n. 7 (1985), "[t]he Japanese Commodity Tax Law defines the taxable basis of the television sets in terms which are virtually identical to the terms of foreign market value." Because purchase price and exporter's sales price are defined so that determinations may be fairly compared with determinations of FMV, it would seem relatively simple to arrive at an appropriate basis for calculating the amount of commodity tax which was not collected on the exported merchandise.

The government points out that Article 13 of the Japanese Commodity Tax Law sets forth an alternative method for determining the tax base, using the manufacturer's published suggested retail price less a standard deduction to cover ordinary profits and expenses of sellers other than the manufacturer, freight charges, and the amount of the commodity tax. The government expresses uncertainty as to when Ar-

---

foreign market value (or the fact that the United States Price is the same as the foreign market value) is wholly or partly due to—

\* \* \* \* \* \*

(B) other differences in circumstances of sale

\* \* \* \* \* \*

then due allowance shall be made therefor.

**21.** This would provide foreign manufacturers or exporters with a means to circumvent the scrutiny of the antidumping law, in cases where *ad valorem* margins would otherwise be just above the *de minimis* level.

**22.** The court does not imply that the circumstances of sale adjustment could not be extended to include any portion of the tax differential (reflected in the home market price) generated by bona fide differences in the circumstances of sale, to the extent that such items are not included in the tax base for the exported merchandise. The theory supporting such an adjustment would be that those items are excluded from a proper price comparison between the domestic and exported merchandise, and the tax on those items is part of the cost of those items.

ticle 13 would come into play. Article 13 appears to be merely a permissible alternative method of calculating the commodity tax base which is available to manufacturers who apply in advance for such treatment. Article 13.2. It thus would not seem relevant to tax-base calculations for merchandise exported to the United States. Furthermore, Article 13 clearly seeks to construct a tax basis that is in principle comparable to the ex-factory wholesale price basis set forth in Article 11. The court, therefore, does not see Article 13 as a formidable obstacle.

The admitted fact that the ITA made no special inquiry into the operation of the Japanese Commodity Tax Law raises the suspicion that the agency's professed inability to calculate the adjustment was pretextual. The court expresses no opinion as to whether the information obtained in the previous administrative proceeding is sufficient for a proper calculation of the adjustment. The court merely holds that on remand the ITA must calculate the adjustment, in the first instance, by adding to USP the amount of Japanese commodity tax determined to have been rebated or not collected upon the merchandise exported to the United States by reason of its exportation, in accordance with the requirements of § 1677a(d)(1)(C).[23]

### Assumption of Full Pass-Through

■ The second part of 19 U.S.C. § 1677a(d)(1)(C) provides that the amount of the adjustment may not exceed "the extent to which such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation." In the challenged determination, the ITA acknowledged that this language directed it to ascertain the extent to which the commodity tax resulted in increased home market prices, and to limit by that amount the offsetting adjustment to USP. Nevertheless, the ITA assumed a

full pass-through of the tax in all cases, asserting that this assumption was reasonable because "[t]o date, the Department has not developed a reasonable method for isolating the cost-price relationship for individual adjustments." In the subsequent *Korean Pianos* determination, however, the ITA concluded that the pass-through clause in § 1677a(d)(1)(C) was not intended to require the measurement of tax absorption, but instead was intended merely to facilitate harmony between the adjustment and the administration of the countervailing duty law. The issues confronting the court therefore are, first, whether the pass-through clause was intended to require the measurement of tax absorption, and if so, whether the ITA acted within its discretion by simply assuming a full pass-through.

The Japanese intervenors contend that the pass-through clause in § 1677a(d)(1)(C) does not call for the measurement of tax absorption because the statute states that the adjustment shall be made to the extent that the tax is added to "or included in" the home market price. The intervenors assert that "the total amount of the tax imposed is *always* 'included in' the resulting price." (Matsushita *et al.*, brief in opposition to Zenith's motion, at 25). This trivialized reading of the words "included in" must be rejected for the reasons that it would render the pass-through clause entirely superfluous and it conflicts with the explanation of the clause given by the House committee that drafted it. *Huffy Corp. v. United States*, 10 CIT ——, 632 F.Supp. 50, at 56–57 (1986). In support of their reading of "included in", Matsushita *et al.* advance a line of customs law valuation cases holding that certain costs such as taxes, freight charges and packing costs are "included in" the dutiable home market price. *See United States v. Zellerbach Paper Co.*, 28 C.C.P.A. 303, 309 (1941); *General Foods Corp. v. United States*, 22 Cust.Ct. 401,

**23.** The ITA may not perform the adjustment by increasing USP in the amount of tax paid on home market sales, as it did in the previous preliminary determination. Because this amount would clearly be excessive in cases

where pre-tax dumping margins are present, it could not possibly constitute the "best information available" of what the amount of the adjustment should be.

405 (1949); *United States v. Passavant,* 169 U.S. 16, 22, 18 S.Ct. 219, 222, 42 L.Ed. 644 (1898). These cases are plainly inapposite and do not in any event support the intervenors' interpretation. As the Customs Court explained in *General Foods, supra,* "[i]t is obvious that since the market value or price includes the cost of containers and coverings, the cost ... intended by the statute to be included is the cost *to the purchaser.*" (emphasis in original).

The ITA presents a far more elaborate and creative interpretation of the pass-through clause in *Korean Pianos, supra.* The ITA therein declares that Congress' overriding purpose for amending the tax adjustment provision in the Trade Act of 1974 was to achieve "harmonized tax treatment" between the Antidumping Act and Treasury Department administration of the countervailing duty law. The ITA attempts to assimilate the pass-through clause within that purpose and concludes that Congress intended the clause to be meaningful only if some future court decision or treaty were to require Treasury to measure tax absorption in countervailing duty determinations.

The major difficulty with this "future contingent" interpretation of the pass-through clause is that not a hint of it appears in the statutory language or the legislative history. The clause is worded and explained, rather, as placing an absolute, unconditional cap on the adjustment in all cases. At bottom, the ITA must seek refuge in its view that Congress intended its expressions concerning "harmonized tax treatment" to overshadow its straight-forward explanation of the operation and purpose of the pass-through clause.

As the legislative history clearly reveals, the 1974 amendment to the tax adjustment provision consisted of two distinct changes that were enacted for independent reasons. The first change was proposed by the administration in 1973 to remedy a conflict between this provision of the Antidumping Act and the Treasury Department's longstanding practice under the countervailing duty law of treating tax rebates to foreign exporters as unfair, countervailable subsidies unless the rebated tax was "directly related" to the product being exported or components thereof. Because the Antidumping Act broadly required an addition to purchase price and exporter's sales price of the amount of any taxes imposed in the country of exportation "upon the manufacturer, producer, or seller, in respect to the manufacture, production or sale of the merchandise" which have been rebated or not collected by reason of the exportation of the merchandise to the United States, the Antidumping Act arguably sanctioned foreign tax practices which Treasury regarded as unfair under the countervailing duty law. Consequently, the administration proposed that the purchase price and exporter's sales price provisions of the Antidumping Act be amended to require the addition of

> the amount of any taxes imposed in the country of exportation *directly upon the exported merchandise or components thereof,* which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States.

*See Hearings Before the House Committee on Ways and Means on H.R. 6767,* 93d Cong., 1st Sess. 55–57 (1973). The administration's analysis of this change was as follows:

> The amendment would conform the standard in the Antidumping Act to the standard under the countervailing duty law, thereby harmonizing tax treatment under the two statutes. With the amendment, no adjustment to the advantage of the foreign exporter would be permitted for indirect tax rebates unless the direct relationship of the tax to the product being exported, or components thereof, could be demonstrated.

*Id.* at 135.

While Congress enacted the administration's proposal, it also added the qualifying clause:

> but only to the extent that such taxes are added to or included in the price of

*such or similar merchandise when sold in the country of exportation.*

Pub.L. No. 93–618, Title III, Ch. 2, § 321(b), (c), 88 Stat. 2045, 2046 (1975). This second change in the tax adjustment provision was not tied to the concern for "harmonized tax treatment." Rather, it was added because Congress had become aware that indirect taxes, including taxes imposed directly on merchandise, often were not fully shifted forward to purchasers; and Congress did not want the adjustment for such a tax to increase United States price calculations by an amount greater than the price increase which the tax generated in comparison home market sales.[24] The House Ways and Means Committee, which drafted the pass-through clause, explained this distinct purpose in its comments on the amendment to the tax adjustment provision. The committee stated:

> The second amendment deals with the treatment of certain types of tax rebates in computing purchase price. The amendment would conform the standard in the Antidumping Act to the standard under the countervailing duty law, thereby harmonizing tax treatment under the two statutes. However, your committee, in recommending this amendment, does not express approval or disapproval of the standard employed by the Treasury Department in administering the countervailing duty law with regard to the treatment under that law of rebates or remissions of direct and indirect taxes. With the amendment, no adjustment to the advantage of the foreign exporter would be permitted for indirect tax rebates unless the direct relationship of the tax to the product being exported, or components thereof, could be demon-strated. *Further, an adjustment for such tax rebates would be permitted only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation. This is to insure that the rebate of such taxes confers no special benefit upon the exporter of the merchandise that he does not enjoy in sales in his home market. To the extent that the exporter absorbs indirect taxes in his home market sales, no adjustment to purchase price will be made and the likelihood or size of dumping margins will be increased.*

*H.R.Rep. No. 571*, 93d Cong., 1st Sess. 69 (1973) (emphasis added).

The administration also acknowledged the distinct purpose of the pass-through clause added by the House. In a statement to the Senate Finance Committee, Ambassador William D. Eberle, special representative for trade, explained:

> The definitions of both "purchase price" and "exporter's sales price" are amended to harmonize the treatment of foreign tax rebates under the Antidumping Act with the standard of their treatment under the countervailing duty law. No adjustment for tax rebates to the advantage of the foreign exporter will be permitted unless the direct relationship between the tax and the exported product or its components can be demonstrated. For example, if the exported product benefited from a tax rebate on the mortgage on the plant that produced it, the rebate could not be used in the computations to reduce the dumping margin. *Moreover, an adjustment for a tax rebate will be permitted only to the extent such taxes are added to or includ-*

---

**24.** As the ITA explained in *Korean Televisions I,* 49 Fed.Reg. at 7624:

> The differing treatment of direct vs. indirect taxes under GATT and U.S. law arose from the assumptions that indirect taxes were fully shifted forward to purchasers while direct taxes were absorbed by sellers. By the late 1960's, however, academic literature and U.S. government reports cast doubt on the veracity of these assumptions. It is clear that the

Congress in 1974 was aware of these doubts. In light of the public debate, it is only reasonable to conclude that the Congress, in its addition to [§ 1677a(d)(1)(C) ] of the "but only to the extent" language, intended that we measure absorption and limit the addition to the tax passed through.

This language was reiterated in *Taiwan Televisions,* 49 Fed.Reg. at 7632, and *Korean Televisions II,* 49 Fed.Reg. at 50421.

*ed in the price of the merchandise when sold in the home market. To the extent the exporter absorbs indirect taxes in sales in the home market, no adjustment will be made to purchase price. The effect will be to increase the size of dumping margins under such circumstances.*

*Hearings Before the Senate Committee on Finance on H.R. 10710,* 93d Cong., 2d Sess. 310 (1974) (emphasis added).

The Senate Finance Committee adopted the House amendment, including the pass-through clause, without change, stating:

> The second amendment deals with the treatment of certain types of tax rebates in computing purchase price and would provide that foreign indirect taxes, rebated or remitted upon the export of the imported merchandise in question, will be added back to purchase price only if such indirect taxes are imposed directly upon the exported product or its components, *and then only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.* The present standard for the treatment of such tax rebates or remissions which is now contained in the act is significantly broader and requires the adding back to the purchase price of a wider range of taxes, to the advantage of the foreign manufacturer, than would be allowed under the proposed amendment. The standard in the proposed amendment parallels that standard employed by the Treasury Department under the countervailing duty law in determining whether tax rebates and remissions constitute bounties or grants. However, the Committee, in recommending this amendment, does not express approval or disapproval of that Treasury practice.

*S.Rep. No. 1298,* 93d Cong., 2d Sess. 172 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7186, 7309 (emphasis added).

The language in the House report concerning "harmonized tax treatment" (which is paraphrased in the Senate report) was lifted directly from the administration's comments on its 1973 proposal containing no cap provision. Just as Congress added the cap provision to the administration's proposal, Congress added its explanation of the cap provision to the administration's comments.[25] The "disharmony" Congress sought to cure, therefore, was addressed by the narrowing of the adjustment to taxes "imposed ... directly upon the merchandise." Because the statute would now incorporate the "directly related" test, no margin-reducing adjustment would be made for tax rebates or remissions which Treasury regarded as unfair subsidies under the countervailing duty law. *Cf., American Express Co. v. United States,* 472 F.2d 1050 (C.C.P.A.1973) (upholding Treasury's imposition of countervailing duties based on rebate of indirect taxes not directly related to merchandise being exported).

The ITA carries the "harmonization" theme too far when it declares that Congress could not have intended a requirement under the antidumping law that tax shifting be measured because "[i]n administering the countervailing duty law, Treasury did not measure the degree of tax shifting in individual cases involving final stage indirect taxes." 50 Fed.Reg. at 37563. Apart from the fact that Congress gave no indication that it intended the pass-through clause to be meaningful only as a future possibility, the House and Senate reports both emphasized that the committees expressed neither approval nor disapproval of Treasury's practice under the countervailing duty law. The amendment directed the administering agency to limit

**25.** Likewise, Ambassador Eberle's explanation of the 1974 amendment before the Senate Finance Committee, quoted above, employed the identical language concerning "harmonized tax treatment" that he previously used to explain the administration's 1973 proposal before the House Ways and Means Committee. *Hearings Before the House Committee on Ways and Means on H.R. 6767,* 93d Cong., 1st Sess. 362 (1973). The only change was the addition of the language explaining of the cap provision in the subsequent statement.

the antidumping law adjustment by the amount of tax shifted forward to home market purchasers; it did not direct the agency to measure tax absorption in countervailing duty determinations, or otherwise declare that the full rebate by the country of exportation of taxes directly related to the exported merchandise constitutes an unfair subsidy.

It is true that one justification advanced for Treasury's practices under the countervailing duty law concerning tax rebates has been the assumption that final stage indirect taxes are fully passed onto the purchaser whereas other taxes are absorbed by the seller. *See American Express Co. v. United States,* 472 F.2d at 1058. Those practices, however, need not rest upon assumptions concerning tax incidence. As the Supreme Court emphasized in *Zenith Radio Corp. v. United States,* 437 U.S. 443, 456–57, 98 S.Ct. 2441, 2448, 57 L.Ed.2d 337 (1978), the practice of imposing no countervailing duty for the non-excessive rebate of indirect taxes directly related to exported merchandise may be viewed as a reasonable means of avoiding the effect of double taxation, since those indirect foreign taxes are akin to excise and sales taxes imposed on goods consumed in this country. Clearly there is no contradiction in viewing the full rebate of an indirect tax imposed directly upon exported merchandise as a fair practice under the countervailing duty law, and yet limiting the adjustment for that rebate under the antidumping law to the amount by which the tax has increased the home market price. Antidumping duties—as opposed to countervailing duties—"are imposed on the basis of differences in value, *not* differences in cost." *Smith-Corona Group v. United States,* 713 F.2d at 1575 (emphasis in original).

The ITA's argument in *Korean Pianos* that a meaningful interpretation of the pass-through clause in § 1677a(d)(1)(C) would conflict with the purpose of the adjustment in § 1677a(d)(1)(D) is transparently invalid. Section 1677a(d)(1)(D) provides that USP shall be increased by the amount of any countervailing duty imposed on merchandise to offset an export subsidy. The House Ways and Means Committee explained that the provision would assure that the tax rebates which subjected the merchandise to countervailing duties would not unfairly subject them to antidumping duties as well. *H.R.Rep. No. 571,* 93d Cong., 1st Sess. 70 (1973). The ITA asserts that in a combined countervailing duty and antidumping case, where USP is increased under § 1677a(d)(1)(D) by the amount of tax rebates or exemptions found to be an export subsidy, an increase to USP under § 1677a(d)(1)(C) by less than the full amount of the remaining portion (because a lesser amount was passed through to home market purchasers) would be "clearly contrary to Congress's purpose because it would lead to assessment of both antidumping and countervailing duties by virtue of the same tax rebates in a combined case." 50 Fed.Reg. at 37564. In fact, in the ITA's example no antidumping duties would flow from the portion of the tax rebates or exemptions found to be an export subsidy. Hence, there is no contradiction with Congress' purpose.

The House Ways and Means Committee, in the passage from its 1973 report quoted at 1396–1397, *ante,* could hardly have expressed its intention more clearly that the pass-through clause must be interpreted to limit the adjustment by the amount of tax *actually* passed through to home market purchasers. The report of the Senate Finance Committee states nothing to contradict or detract from that interpretation. The inescapable conclusion is that Congress intended the administering agency to perform tax absorption measurements for application in individual cases.[26]

26. Astonishingly, in *Korean Pianos,* after reciting the referenced passages from the House and Senate committee reports, the ITA remarks:

  [N]othing in either the statute or the above-quoted legislative history requires that the De-

partment measure tax absorption in individual cases. Because Congress was aware of the problems inherent in measuring tax absorption, if Congress truly intended that the Department embark upon such a hazardous un-

Having acknowledged in the challenged determination that § 1677a(d)(1)(C) directed it to measure tax absorption, the ITA considered and rejected the methodology for performing the measurement suggested by Zenith and the Unions and declared that it knew of no "reasonable" method for performing the measurement. The ITA then, without any determination of tax absorption, calculated the adjustment for the full amount of the tax, stating that "[a]bsent evidence that clearly demonstrates a manufacturer's commodity tax cost is not reflected in home market sales prices, the Department may reasonably conclude that cost and price are directly related." This statement is a fortified paraphrase of the Federal Circuit's holding in *Smith-Corona Group v. United States*, 713 F.2d at 1577 n. 26, that "absent evidence that costs do not reflect value, the Secretary may reasonably conclude that cost and value are directly related." The ITA's reliance on *Smith-Corona* is misplaced. *Smith-Corona* involved a challenge to an ITA regulation allowing the agency to base the circumstances of sale adjustment under § 1677b(a)(4)(B) primarily on cost criteria. *See* 19 C.F.R. § 353.15(d) (1980). In sustaining the regulation as it was applied in that case, the court emphasized that in § 1677b(a)(4)(B) Congress expressly granted discretion to the administering authority to determine the extent of the adjustment. Hence, in the absence of evidence to the contrary, the statute permitted the ITA to assume a direct relationship between cost and price. 713 F.2d at 1575–77. In § 1677a(d)(1)(C), by contrast, Congress has inserted the express requirement that the adjustment be made "only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation." [27] In adding this requirement, Congress explained that "[t]o the extent that the exporter absorbs indirect taxes in his home market sales, no adjustment to purchase price will be made and the likelihood or size of dumping margins will be increased." *H.R.Rep. 571, supra,* at 69. To permit the ITA to assume, without any evidentiary basis, that home market price always reflects the full amount of such taxes would effectively render the pass-through clause a nullity and would defeat the express will of Congress. As Judge Carman of this court recently remarked in *Huffy Corp. v. United States, supra* at 1388:

> We must conclude that Congress recognized that not all taxes are passed on to the home market, and therefore required some showing that such a tax is passed on before its rebate could be the source of an adjustment. To support an adjustment for a tax rebate there must be substantial evidence in the record to support the conclusion that the tax was passed on to the home market.

(footnote omitted).[28] Decidedly, evidence revealing only the manufacturers' commodity tax costs does not constitute substantial evidence.[29]

---

dertaking, it surely would have made its intent more clear. 50 Fed.Reg. at 37563.

**27.** The applicable ITA regulation, 19 C.F.R. § 353.10(d)(1)(iii), incorporates the precise language of the pass-through clause. *See* note 16, *ante.* In contrast to the circumstances of sale adjustment regulation, no regulation purports to authorize reliance on manufacturer's cost to determine the amount of tax added to or included in the home market price.

**28.** Although this holding in *Huffy* was not essential to the court's decision, the court finds Judge Carman's reasoning particularly persuasive.

**29.** While the *Smith-Corona* holding permitting cost-based "circumstances of sale" adjustments

is manifestly inapplicable to the foreign tax adjustment under § 1677a(d)(1)(C), the instant case is also distinguishable from *Smith-Corona* with respect to the evidence presented. Whereas the record in *Smith-Corona* contained no factual evidence tending to prove or disprove a direct cost-price relationship, the record below reveals numerous instances in which the sum of the commodity tax price plus the amount of the commodity tax exceeded the final price actually paid by home market purchasers (after receiving discounts, rebates and other allowances from the manufacturer). *See* R.Doc. 554 PUBLIC at 6–7. The evidence of these price discrepancies constitutes at least a *prima facie* showing that manufacturers' commodity tax costs were not fully reflected in home market sales prices. Accordingly, even if the *Smith-Corona* holding

Although § 1677a(d)(1)(C) requires the ITA to measure actual tax absorption, it leaves the precise method of performing this measurement to the discretion of the agency. However, the ITA may not place the burden on a private party to advance a method of measuring tax absorption which the ITA deems acceptable, in failure of which it performs no measurement whatsoever. Rather, the *agency* must find a methodology for measuring absorption which it considers satisfactory and must base its measurements upon substantial evidence.

The court leaves open whether the simple method of subtracting after-invoice discounts and rebates from gross invoice prices, suggested by Zenith and the Unions below, is sufficient, or whether an econometric approach is required. In prior determinations, the ITA has declared that an econometric measurement of tax absorption is "impossible", explaining:

> The degree of [tax] shifting depends upon, among other things, the demand for the product, actions of the monetary authorities, the stage of the business cycle and the degree of competition among the producers of the product. In short, the Department would have to know the shape and position of the supply and demand curves for a product in the absence of tax to determine the price that would then exist. The Department would have to know these facts for each point in time at which a sale, chosen for comparison to a U.S. sale, occurred.

*Korean Televisions I*, 49 Fed.Reg. at 7624; *Taiwan Televisions*, 49 Fed.Reg. at 7632; *Korean Televisions II*, 49 Fed.Reg. at 50421. Plaintiffs have persuasively argued in their briefs before the court that the ITA has significantly overstated what is required; that the agency would only need estimates of the normal long-run elasticities of supply and demand for television sets in Japan during a time period including the one under review.[30] They point out that generally accepted economic theory holds that "the burden of a tax is divided between buyer and seller as the ratio of elasticity of supply to elasticity of demand in the relevant range of demand and supply schedules." R. Musgrave & P. Musgrave, *Public Finance in Theory and Practice* 272 (4th ed. 1984).[31] In any event, whatever the measurement entails it is well established that an administrative agency lacks the authority to disregard a statutory obligation merely because the tasks required are difficult or complicated. *See, e.g., United States v. H. Rosenthal Co., supra; United States ex rel. Kansas City Southern Ry Co. v. ICC*, 252 U.S. 178, 185–88, 40 S.Ct. 187, 188–89, 64 L.Ed.2d 517 (1920); *Continental Steel Co. v. United States*, 9 CIT ——, 614 F.Supp. 548, 554 (1985), *appeal docketed*, No. 85–2805 (Fed.Cir. Sept. 24, 1985).

The court lastly turns to the final argument presented by the ITA in *Korean Pianos*. The petitioners therein had urged that the ITA "calculate the relative tax burdens of buyers and sellers in the home market by measuring the relative elasticity

---

were somehow applicable, it would seem, in light of the caveat in footnote 26 of that opinion, that the ITA could not merely assume in the face of such a showing, with nothing further, that the tax was fully passed through to home market purchasers. *But see Timken Co. v. United States*, 10 CIT ——, 630 F.Supp. 1327, at 1348–50 (1986) (upholding cost-based circumstances of sale adjustment against evidentiary challenge).

**30.** There is a substantial body of literature on how demand and supply elasticities may be measured. *See, e.g.,* R. Stern, *et al., Price Elasticities in International Trade: An Annotated Bibliography* (1976); *The Theory and Empirical*

*Analysis of Production* (M. Brown ed. 1967). Indeed, the International Trade Commission has estimated demand elasticities for several industries. *See* Office of Economic Research, USITC, *Foreign Trade Elasticities for Twenty Industries* (Jan. 1975).

**31.** The same authors conclude (at 273) that "a product tax tends to fall on the consumer if demand is inelastic while supply is elastic, and on the producer when the opposite holds." Because the demand for television sets in Japan would naturally show some degree of elasticity, the ITA's assumption that the commodity tax is fully shifted forward to purchasers in all cases is unrealistic and unreasonable.

of supply and demand for pianos in Korea." 50 Fed.Reg. at 37561. This is the econometric approach discussed above. The ITA's final response to this proposal was as follows:

> Finally, the Department can perceive no economic justification for adjusting the home market-U.S. price differential by anything less than the actual amount of final stage taxes paid by the producers. We believe that the antidumping duty law is intended to remedy situations in which a foreign producer accepts a lesser return on his U.S. sales than on his home market sales. Where the costs of production and sale are identical in both markets, any difference in price will represent a difference in return. Where the costs of production and sale differ between markets, any difference in price will represent a difference in return only after the price differential has been adjusted by the net amount of the differences in cost. A difference in final stage tax liability is just as much a difference in the cost of production and sale as any difference in material costs or credit expenses. Therefore, just as we have always adjusted the price differential by the amount of any difference in material costs and credit expenses, we believe we should also make such an adjustment for any difference in final stage tax liability.

*Id.* at 37564. Whereas the *Smith-Corona* decision sustained the ITA's discretion to assume as a practical matter in limited situations that differences in manufacturer's costs reflect differences in price or value, the ITA now brazenly leaps to a purely cost-based view of the antidumping law, wherein the effect of cost on price is not relevant even in principle. While this may be the antidumping law Commerce officials would like to see, it is not the antidumping law presently in place. As the Federal Circuit emphasized at length in *Smith-Corona:*

> The language of the statute ... specifies that adjustments are to be made on the basis of differences in *price* or *value.* This approach is followed consistently throughout the antidumping law. Cost

is generally relied upon only when value cannot readily be determined from price. Antidumping duties are imposed on the basis of differences in value, *not* differences in cost.... Thus, cost criteria alone will not redress the full margin of dumping to which Congress sought to attach an antidumping duty. Value *must* be considered under the statute.

> \* \* \* \* \* \*

> The legislative history reflects a long felt and understandable congressional distrust of *cost* as the basis for the computation of dumping duties.

> \* \* \* \* \* \*

> The Secretary may not ... rely on cost to *the exclusion* of its effect on value.

713 F.2d at 1575–77 (emphasis in original).

■ It is the duty of the ITA to enforce and administer the provisions of the antidumping law as they have been written by Congress and interpreted by the courts. That Congress intentionally chose to base the calculation of dumping margins on differences in price or value, not differences in cost, is well settled. In 19 U.S.C. § 1677a(d)(1)(C), Congress' addition of the pass-through clause has foreclosed the administrative option of blindly assuming a full pass-through of the adjusted-for tax. Accordingly, on remand, after determining the amount of Japanese commodity tax rebated or not collected upon televisions exported to the United States, the ITA must determine the amount of commodity tax added to or included in the home market price in comparison sales. These determinations must be based upon substantial evidence. The ITA must then calculate the adjustment in each case in the lesser of these two amounts.

### Conclusion

To summarize, the ITA abused its discretion by failing to calculate the foreign indirect tax adjustment, provided in 19 U.S.C. § 1677a(d)(1)(C), as an addition to USP in the amount of Japanese commodity tax rebated or not collected upon the merchan-

dise exported to the United States. The ITA further abused its discretion by failing to measure tax absorption in home market sales so as to limit the adjustment by the amount of tax passed through to home market purchasers. The agency's conclusion that a full pass-through occurred in all cases is not supported by substantial evidence. Therefore, these actions are remanded to the ITA for recalculation of the adjustment in a manner consistent with this opinion.

In accordance with the foregoing, it is ORDERED:

1. That plaintiffs' respective motions, filed pursuant to Rule 56.1 of this court, are hereby granted.

2. That the cross-motion of defendant, United States, for remand is hereby granted in part in accordance with the terms of the foregoing opinion.

3. That the Final Results challenged herein are hereby reversed with respect to the ITA's determination of the adjustment for the Japanese commodity tax under 19 U.S.C. § 1677a(d)(1)(C).

4. That these actions are hereby remanded to the ITA for recalculation of the said adjustment in a manner consistent with the foregoing opinion.

5. That the ITA shall report the results of its recalculations and redeterminations to this court within 90 days after the date of entry of this order.