**FEDERAL–MOGUL CORPORATION, Plaintiff,**

**The Torrington Company, Plaintiff–Intervenor,**

**v.**

**UNITED STATES, Defendant,**

**NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation; Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.; Peer Bearing Company; NSK Ltd. and NSK Corporation, Defendants–Intervenors.**

**Court No. 91–07–00530.**

United States Court of International Trade.

Feb. 4, 1993.

Frederick L. Ikenson, P.C., Frederick L. Ikenson, J. Eric Nissley, Joseph A. Perna, V and Larry Hampel, for plaintiff Federal–Mogul Corp.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Wesley K. Caine, Christopher J. Callahan,

John M. Breen and Amy S. Dwyer, for plaintiff-intervenor The Torrington Co.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis, of counsel: John D. McInerny, Acting Deputy Chief Counsel for Import Admin., Dean A. Pinkert, Stephen J. Claeys and Craig R. Giesze, Attorney–Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, for defendant.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman, Neil R. Ellis, Susan E. Silver and Niall P. Meagher, for defendants-intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.

Barnes, Richardson & Colburn, Robert E. Burke, Donald J. Unger, Kazumune V. Kano and Diane A. MacDonald, for defendants-intervenors NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Corp.

Coudert Brothers, Robert A. Lipstein, Matthew P. Jaffe and Nathan V. Holt, for defendants-intervenors NSK Ltd. and NSK Corp.

Venable, Baetjer, Howard & Civiletti, John M. Gurley, John C. Dibble and Lindsay B. Meyer, for defendant-intervenor Peer Bearing Co.

## OPINION

TSOUCALAS, Judge:

Plaintiff, Federal–Mogul Corporation ("Federal–Mogul"), commenced this action to challenge certain aspects of the Department of Commerce, International Trade Administration's ("ITA") final results in the first administrative review of imports of antifriction bearings from Japan. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Final Results of Antidumping Duty Administrative Reviews ("Final Results"),* 56 Fed.Reg. 31,754 (1991). Substantive issues raised by the parties in the underlying administrative proceeding were addressed by the ITA in the issues appendix to *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts*

*Thereof From the Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review ("Issues Appendix"),* 56 Fed.Reg. 31,692 (1991).

Defendant-intervenors, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo"), now move pursuant to Rule 56.1 of the Rules of this Court for partial judgment on the agency record in regard to certain claims which may affect Koyo raised by Federal–Mogul in its challenge to certain aspects of the ITA's Final Results.

### Background

On June 11, 1990, the ITA initiated an administrative review of imports of ball bearings, cylindrical roller bearings, spherical plain bearings and parts thereof from Japan. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom Initiation of Antidumping Administrative Reviews,* 55 Fed. Reg. 23,575 (1990).

On March 15, 1991, the ITA published its preliminary determination in the administrative review. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts thereof from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Antidumping Duty Administrative Reviews ("Preliminary Results"),* 56 Fed.Reg. 11,186 (1991). In the Preliminary Results, the ITA calculated that Koyo's margin for ball bearings was 0.49% and Koyo's margin for cylindrical roller bearings was 0.02%. Koyo had no sales of spherical plain bearings during the period of review. *Preliminary Results,* 56 Fed. Reg. at 11,189.

On July 11, 1991, the ITA published its Final Results in this proceeding. *Final Results,* 56 Fed.Reg. 31,754. The ITA calculated margins of 9.82% for Koyo's ball bearings and 1.45% for Koyo's cylindrical roller bearings. *Id.* at 31,756.

Federal–Mogul has challenged the following actions by the ITA which may im-

pact Koyo's dumping margin alleging that these actions were unsupported by substantial evidence on the administrative record and not in accordance with law: (1) the ITA's use of a methodology for adjusting United States price ("USP")[1] and Foreign Market Value ("FMV")[2] for the Japanese value added tax ("VAT") that failed to measure the tax incidence or "pass through" of the tax to the consumer in the home market, that granted a circumstance of sale ("COS") adjustment to FMV to achieve tax neutrality, the incorrect calculation of the tax base for U.S. sales and the failure to impose a cap on the VAT adjustment to USP; (2) the ITA's method of calculating cash deposit rates for estimated duties; (3) the ITA's failure to adjust home market selling expenses for delayed payment of the expenses; (4) the ITA's adjust-

ment of constructed value for differences in COS; (5) the ITA's treatment of U.S. sales commissions; (6) the ITA's failure to deduct antidumping duty related legal expenses from the exporter's sales price ("ESP"); and (7) the ITA's failure to deduct estimated antidumping duties from USP. *Federal–Mogul Corporation's Opposition to the Motion for Judgment on the Agency Record ("Federal–Mogul's Opposition")* at 6–80.

## Discussion

The Court's jurisdiction over this matter is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

A final determination by the ITA in an administrative proceeding will be sustained unless that determination is "unsupported

1. Purchase price and exporter's sales price ("ESP") are the two types of United States price. USP, purchase price and ESP are defined at 19 U.S.C. § 1677a (1988):

    **(a) United States price**
    [T]he term "United States price" means the purchase price, or the exporter's sales price, of the merchandise, whichever is appropriate.
    **(b) Purchase price**
    "[P]urchase price" means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States.
    **(c) Exporter's sales price**
    "[E]xporter's sales price" means the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter.
    The purchase price is normally used as USP where the transaction prior to importation is between unrelated parties, or at arm's length. The exporter's sales price will be used as the USP when the U.S. importer and the foreign seller are "related parties." *See* 19 U.S.C. § 1677(13) (1988). The exporter's sales price will be the price at which the merchandise is first sold to an unrelated purchaser in the United States. 19 U.S.C. § 1677a(c).

2. In an administrative review, the ITA is required to calculate "the [FMV] and [USP] of each entry of merchandise subject to the antidumping duty order" and determine "the amount, if any, by which the [FMV] of each such entry exceeds the [USP] of the entry." 19 U.S.C. § 1675(a)(2) (1988).
    19 U.S.C. § 1677b(a) (1988) defines FMV:
    **(1) In general**

    The foreign market value of imported merchandise shall be the price, ...
    (A) at which such or similar merchandise is sold ... in the principal markets of the country from which exported ..., or
    (B) if not sold or offered for sale for home consumption, ... then the price at which so sold or offered for sale for exportation to countries other than the United States, ....
    **(2) Use of constructed value**
    If the administering authority determines that the foreign market value of imported merchandise cannot be determined under paragraph (1)(A), then, notwithstanding paragraph (1)(B), the foreign market value of the merchandise may be the constructed value of that merchandise, as determined under subsection (e) of this section.
    "Constructed value" is defined at 19 U.S.C. § 1677b(e):
    **(e) Constructed value**
    **(1) Determination**
    For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of—
    (A) the cost of materials ... and of fabrication or other processing of any kind employed in producing such or similar merchandise ...;
    (B) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation ..., except that—
    (i) the amount for general expenses shall not be less than 10 percent of the cost as defined in subparagraph (A), and
    (ii) the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost....

by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States*, 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

### 1. Treatment of Value Added Tax

■ At issue here is the ITA's treatment of the Japanese VAT pursuant to 19 U.S.C. § 1677a(d)(1)(C) (1988) which states:

**(d) Adjustments to purchase price and exporter's sales price**

The purchase price and the exporter's sales price shall be adjusted by being—

(1) increased by—

. . . . .

(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation; ....

In the Final Results, the ITA explained its treatment of VATs as follows:

We calculated the addition to USP by applying the [home market] tax rate to the net U.S. price after all other adjustments were made. This imputed tax amount is BIA, because HM sales were reported net of VAT, and we are thus unable to determine what the home market tax base was.

We imposed no limitation on the imputed tax added to USP on the basis of the incidence of the HM tax, because the statute requires no such limitation....

Because all HM sales were reported net of VAT, we added the same VAT amount to FMV as that calculated for USP. This is equivalent to calculating the actual HM tax, and then performing a circumstance-of-sale adjustment to FMV to eliminate the absolute difference between the amount of tax in each market.

*Issues Appendix*, 56 Fed.Reg. at 31,729.

NSK Ltd. and NSK Corporation ("NSK") argues that the statute does not require that FMV contain home market excise taxes and that in situations, as here, where FMV is reported net tax, the provisions of 19 U.S.C. § 1677a(d)(1)(C) do not apply and no adjustment need be made to USP. *NSK's Response in Support of Koyo's Motion for Judgment on the Agency Record ("NSK's Response")* at 11–18.

This Court does not agree. The plain language of 19 U.S.C. § 1677a(d)(1)(C) requires that USP be increased by the amount of any indirect tax imposed on sales of the subject merchandise in the home market, regardless of whether FMV is reported net tax or not. *Zenith Elecs. Corp. v. United States ("Zenith I")*, 10 CIT 268, 275–82, 633 F.Supp. 1382, 1388–94 (1986), *appeal dismissed*, 875 F.2d 291 (Fed.Cir.1989).

### A. Tax Incidence

■ Federal–Mogul argues that the ITA is required to measure the amount of the VAT which the manufacturer in the home market passes on to the consumer.[3] *Federal–Mogul's Opposition* at 41–46.

Federal–Mogul argues that the phrase "but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation" in 19 U.S.C. § 1677a(d)(1)(C) requires the ITA to make

---

3. For instance, if the price of a product in Japan is $100 and the VAT rate is 10%, the price to the Japanese customer would be $110. However, in economic terms this may not be a true statement of the pricing situation. Federal–Mogul would require an analysis of whether the price would have been higher than $100 if there had

been no VAT. If the analysis showed that the price would have been $102.50 in the absence of a VAT, then the producer succeeded in "passing through" to customers ¾ of the tax ($7.50) and therefore the adjustment to USP should be capped at $7.50.

these measurements. *Id.* Federal–Mogul primarily relies on this court's decision ,in *Zenith I*, 10 CIT at 282–91, 633 F.Supp. at 1394–401. Federal–Mogul also relies on portions of the legislative history of the Trade Act of 1974, which added this provision. *See* Pub.L. No. 93–618, Title III, Ch. 2, Sec. 321, 88 Stat.1978, 2045 (1975); H.R.Rep. No. 571, 93d Cong., 1st Sess. 69 (1973).

The court in *Zenith I* found that the phrase "but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation" in 19 U.S.C. § 1677a(d)(1)(C) requires the ITA "to measure tax absorption in home market sales so as to limit the adjustment by the amount of tax passed through to home market purchasers." 10 CIT at 291, 633 F.Supp. at 1402. The *Zenith I* court placed great reliance on the legislative history of the Trade Act of 1974, especially the report of the House Ways and Means Committee which stated in part:

> Further, an adjustment for such tax rebates would be permitted only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation. This is to insure that the rebate of such taxes confers no special benefit upon the exporter of the merchandise that he does not enjoy in sales in his home market. To the extent that the exporter *absorbs* indirect taxes in his home market sales, no adjustment to purchase price will be made and the likelihood or size of dumping margins will be increased.

H.R.Rep. No. 571 at 69 (emphasis added).

The defendant and NSK counter that the plain language of the statute simply requires that the taxes which are actually paid on the sale of a product, as evidenced by the company's books, are in fact added to the price of that product and that, if one looks at all of the legislative history of the Trade Act of 1974 instead of focusing on the word "absorbs," the legislative history supports the ITA's interpretation. *Defendant's Memorandum in Response to the Motion of Defendant–Intervenors, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., for Judgment Upon the Agency Record* ("*Defendant's Response*") at 15–30; *NSK's Response* at 18–23.

Koyo argues that the methodology used by the ITA is a reasonable interpretation of the statutory language and that there is nothing in the legislative history of the clause to suggest that Congress wanted to require the ITA to measure tax incidence. *Memorandum of Points and Authorities in Support of Defendant–Intervenors' Motion for Judgment on the Agency Record* ("*Koyo's Memorandum*") at 23–28; *Defendant–Intervenors' Reply to Plaintiff's Memorandum in Opposition to Defendant–Intervenors' Motion for Judgment on the Agency Record* ("*Koyo's Reply*") at 32–36.

NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation ("NTN") argue that in this case home market sales were reported net taxes with the amount of tax reported as a separate line on the invoices, therefore, there is evidence on the record showing that the full tax was passed through to the consumer and no pass through analysis need be undertaken. *Reply Brief of NTN* ("*NTN's Reply*") at 13–15.

The Court of Appeals for the Federal Circuit has stated "[a]n agency's interpretation of a statute which it is authorized to administer is 'to be sustained unless unreasonable and plainly inconsistent with the statute, and [is] to be held valid unless weighty reasons require otherwise.'" *ICC Indus., Inc. v. United States*, 812 F.2d 694, 699 (Fed.Cir.1987) (*quoting Melamine Chems., Inc. v. United States*, 732 F.2d 924, 928 (Fed.Cir.1984)). "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984) (citations omitted).

Therefore, this Court must decide whether the ITA's interpretation of the statute is a reasonable one.

This Court finds that the ITA's determination that an analysis of the tax incidence of the Japanese VAT on sales of antifriction bearings in the home market is not required by 19 U.S.C. § 1677a(d)(1)(C) is reasonable.

The Supreme Court has stated:

It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.

Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion.

*Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917) (citations omitted); *see also American Tobacco Co. v. Patterson,* 456 U.S. 63, 69, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982); *Consumer Prod. Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

This Court finds that the language of the statute is plain on its face. Looking at the language of the statute, this Court can find no support for the contention that the ITA *is required* to make a tax incidence analysis. Nowhere in the statute is there any hint that Congress contemplated requiring the ITA to determine the tax incidence of VATs in home market sales.

This Court believes that the plain meaning of the phrase "but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation" simply means that the ITA is to adjust USP in an amount less than or equal to, but not greater than, the actual amount of tax paid on a sale of the subject merchandise in the home market as represented on the company's books or elsewhere in the administrative record.

Faced with a reasonable interpretation of the statute by the administering agency, this Court is constrained to uphold the agency's interpretation. Therefore, this Court declines to follow *Zenith I* and finds that the ITA's determination that 19 U.S.C. § 1677a(d)(1)(C) does not require the ITA to conduct an analysis of tax incidence in the Japanese antifriction bearings market is reasonable and supported by law.

■ This Court believes that this statutory phrase is addressed to the issue of "capping" the actual monetary amount added to USP to adjust for the Japanese VAT by the actual amount of tax paid in the home market and not to conducting an analysis measuring tax incidence.

Federal–Mogul has raised this issue alleging that the ITA failed to "cap" the actual monetary amount added to USP by the actual amount of tax paid in the home market. *Federal–Mogul's Opposition* at 47–48. For example, if the home market price was $100 and the VAT rate is 10%, the tax amount is $10. However, there may be evidence in the administrative record that only $5 of the VAT was paid. Federal–Mogul argues that the ITA should cap the amount added to USP at no more than $5 regardless of what amount is derived from the formula (Net USP X VAT Rate).

This Court agrees that the statute requires the ITA to "cap" the amount of the adjustment to USP by the actual amount of tax paid on sales in the home market. Therefore, this Court orders that on remand the ITA examine the administrative record to determine the exact monetary amount of VAT paid on each sale in the home market and make sure that the amount added to the comparable USP sale is less than or equal to this amount. In this case, the amount paid in the home market as a VAT was a separate line entry on the invoice. This represents evidence that this was the amount actually paid as VAT on that sale. The ITA is instructed to examine the administrative record to determine if any other evidence contradicts this. If none is found, the ITA is instructed to

use the amount of VAT paid on each home market sale as evidenced by the invoice as a "cap" on the amount of the adjustment made to the comparable USP sale pursuant to 19 U.S.C. § 1677a(d)(1)(C). If the administrative record supports the use of some other amount as the "cap," the ITA is instructed to use the other amount.

### B. Circumstance of Sale Adjustment to FMV

■ In its treatment of the Japanese VAT the ITA tried to achieve tax neutrality by eliminating the absolute difference between the VAT amount paid on a home market sale and the addition for the Japanese VAT made to the comparable U.S. sale price by making a circumstance of sale adjustment to FMV pursuant to 19 U.S.C. § 1677b(a)(4)(B) (1988).[4] The ITA explained its methodology in the Final Results as follows:

> Because all HM sales were reported net of VAT, we added the same VAT amount to FMV as that calculated for USP. This is equivalent to calculating the actual HM tax, and then performing a circumstance-of-sale adjustment to FMV to eliminate the absolute difference between the amount of tax in each market.

*Issues Appendix,* 56 Fed.Reg. at 31,729.

ITA believes that the General Agreement on Tariffs and Trade ("GATT") requires the ITA to calculate tax neutral dumping margins.[5] *Defendant's Response* at 49–51.

ITA believes that 19 U.S.C. § 1677b(a)(4)(B) gives the ITA broad authority to grant COS adjustments and "that differences in taxation are no different than any other difference in expenses between the two markets" and therefore qualify for a COS adjustment. *Id.* at 42–43. In support of its contention that the ITA has broad authority to make COS adjustments to achieve tax neutrality, the ITA relies upon *Smith–Corona Group v. United States,* 713 F.2d 1568 (Fed.Cir. 1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). *Defendant's Response* at 47–49. Koyo, NTN and NSK essentially agree with the ITA's position. *Koyo's Memorandum* at 28–32; *Koyo's Reply* at 5–32; *NTN's Reply* at 3–12; *NSK's Response* at 24–26.

In *Smith–Corona* the ITA used 19 U.S.C. § 1677b(a)(4)(B) to grant an "exporter's sales price offset" to FMV for adjustments to ESP for indirect costs. The language of 19 U.S.C. § 1677b(a)(4)(B) has been interpreted to allow only COS adjustments for "direct costs." The Court of Appeals for the Federal Circuit found that the ITA has broad authority to grant COS adjustments pursuant to 19 U.S.C. § 1677b(a)(4)(B) and that a COS adjustment to offset the adjustment to ESP for indirect costs was necessary "to guarantee that the

**4.** 19 U.S.C. § 1677b(a)(4)(B) states in relevant part:

**(4) Other adjustments**
In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—

.   .   .   .   .

(B) other differences in circumstances of sale; or

.   .   .   .   .

then due allowance shall be made therefor. *See also* 19 C.F.R. § 353.56(a) (1991).

**5.** Article VI(4) of the GATT states
No product of the territory of any contracting party imported into the territory of any other contracting party shall be subject to

anti-dumping or countervailing duty by reason of the exemption of such product from duties or taxes borne by the like product when destined for consumption in the country of origin or exportation, or by reason of the refund of such duties or taxes. General Agreement on Tariffs and Trade, *opened for signature* Oct. 30, 1947, 61 Stat. (5), (6), T.I.A.S. No. 1700, 55 U.N.T.S. 187 (1948).
Article 2, paragraph 6, of the GATT Antidumping Code states:
In order to effect a fair comparison between the export price and the domestic price in the exporting country . . . [d]ue allowance shall be made in each case, on its merits, for the differences in conditions and terms of sale, for the differences in taxation, and for the other differences affecting price comparability.
Article 2(6) of the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, *opened for signature* April 12, 1979, 31 U.S.T. 4920, 4926 (1981).

administering authority makes the fair value comparison on a fair basis—comparing apples with apples" even though the adjustment is not being made for direct costs. *Smith–Corona,* 713 F.2d at 1578.

Defendant and defendant-intervenors argue that an "adjustment for a difference in taxation is more clearly within the scope of Commerce's authority to make adjustments to FMV than was the ESP offset, because, unlike the ESP offset, consumption taxes are directly related to each sale." *Defendant's Response* at 48; *see Koyo's Memorandum* at 30–31; *Koyo's Reply* at 31; *NTN's Reply* at 10–11; *NSK's Response* at 24–26.

Federal–Mogul argues that the antidumping law does not require or permit adjustments for commodity taxes to be made in a way which achieves tax neutrality. In support of its position, Federal–Mogul cites to extensive excerpts from the legislative history of the original Antidumping Act of 1921 and its subsequent amendments, as well as certain Executive Branch pronouncements. *Federal–Mogul's Opposition* at 11–39.

Further, Federal–Mogul argues that the *Smith–Corona* case is not applicable to this case stating that the court in *Smith–Corona*

> upheld Commerce's practice of making a COS adjustment to account for a disparity between FMV and USP which the antidumping law does not address at all. Here, Congress knew that forgiven taxes would create a disparity between FMV and USP and *Congress specifically directed that this particular disparity shall be accounted for by way of the tax adjustment to USP.* The congressional silence which permitted the … *Smith–Corona Group* ruling[ ] is replaced here by emphatic congressional pronouncements which repeatedly reject Commerce's and Koyo's position.

*Federal–Mogul's Opposition* at 49 (emphasis in original).

In support of its position, Federal–Mogul relies on a series of cases decided by this court which address this specific issue. *Zenith I,* 10 CIT at 280–81, 633 F.Supp. at 1392–93; *Zenith Elecs. Corp. v. United States* ("*Zenith II*"), 14 CIT 831, 836–40, 755 F.Supp. 397, 405–07 (1990); *Daewoo Elecs. Co. v. United States,* 15 CIT ——, ——, 760 F.Supp. 200, 207–08 (1991).

The court in *Zenith I* made an extensive analysis of this issue and concluded in regard to tax neutrality that:

> When Congress [passed the tax provision in the Antidumping Act of 1921 which required an adjustment to USP], it surely could have seen from simple calculations … that the rejected approach [subtracting the tax from FMV] would achieve a tax neutral comparison in all cases, whereas the enacted approach is (purely) tax neutral only in cases where there is no pre-tax dumping…. [The legislative history of the Antidumping Act of 1921 and its amendments show Congress'] concern that dumping margins not arise *solely* because the exported merchandise is exempted from foreign taxation, which the statutory adjustment achieves. They do not show that Congress intended the adjustment to be purely tax neutral in cases where dumping is otherwise found to occur.

10 CIT at 278–79, 633 F.Supp. at 1391 (emphasis in original). Both the Executive Branch and Congress have been aware for years that the antidumping law does not achieve tax neutral dumping margins where dumping exists pre-tax and no change has been made in the law to address this issue despite numerous opportunities. *See, e.g., Amendments to the Antidumping Act of 1921, As Amended, Hearings Before the Committee on Ways and Means, House of Representatives,* 85th Cong., 1st Sess. 13 (1957).

The court in *Zenith II* squarely addressed the use of COS adjustments in trying to achieve tax neutrality by stating that 19 U.S.C. § 1677b(a)(4)(B)

> is to provide a means for addressing those items *not otherwise included in the statute.* Since the adjustment for tax rebated by reason of exportation is specifically provided for in § 1677a(d)(1)(C), there is no justification for readjusting it under a provision for

"other differences in circumstances of sale."

14 CIT at 837, 755 F.Supp. at 406 (emphasis in original).

This Court agrees with the reasoning expressed by the court in *Zenith I* and *Zenith II.* There is no reason to believe that Congress wished to create complete tax neutrality in the administration of the antidumping law. In fact, the law as it has always existed is not tax neutral in situations where pre-tax dumping exists and Congress has refused to rectify the situation. Any increase in dumping margins under the current statutory scheme is not created by virtue of a country's tax policies but rather by virtue of a foreign manufacturer's pricing policies, just the sort of behavior the antidumping law is designed to influence. If no dumping is occurring, no margin is created. If dumping is occurring, margins *may* be inflated but are not created. This is consistent with the requirements of the GATT.[6]

In addition, this Court agrees with the *Zenith II* court's discussion of when the use of a COS adjustment is justified. Congress has specifically stated how the ITA is to treat a VAT. This is in contrast to the situation in *Smith–Corona.* In *Smith–Corona,* the Court of Appeals for the Federal Circuit allowed the ITA to make a COS adjustment to FMV to offset a statutorily required adjustment to ESP for indirect costs even though the statute specifically refers to allowing COS adjustments only for direct costs. *Smith–Corona,* 713 F.2d at 1577–79. The court allowed this adjustment in order to rectify "a perceived unfairness in the computation of foreign market value" to allow an apples with apples comparison. *Id.* at 1577. Defendant and defendant-intervenors argue that adjusting USP for a VAT while not adjusting FMV to achieve tax neutrality distorts the fair value comparison and results in an apples to oranges comparison. This Court finds that tax neutrality is not a goal of the statute so

there is no need to adjust FMV for the alleged distortion.

Finally, this Court is not convinced that the difference in tax amounts in FMV and USP is a *difference* in circumstance of sale. There is no difference in the tax rate applied but only in the manufacturer's price to which the rate is applied. This Court believes that a difference in the price set by a manufacturer to which the same tax rate is applied is not a difference in circumstance of sale eligible for adjustment under 19 U.S.C. § 1677b(a)(4)(B).

This case presents a unique situation because FMV was reported net VAT. The antidumping statute clearly anticipates a comparison between a FMV value which includes the VAT and an adjustment to USP for this VAT pursuant to 19 U.S.C. § 1677a(d)(1)(C). Therefore, in situations as here where the FMV is reported net of VAT, the ITA must determine the correct VAT amount to be added to FMV based on the verified record before it. In situations where the record shows that the full VAT amount was paid on a home market sale, the ITA is required to add the full VAT amount for that sale to the FMV without any adjustments. In situations where the record shows that the VAT rate varies or where the manufacturer did not pay the full VAT amount, the ITA is required to add only the amount of tax actually paid on each home market sale to FMV.

## C. Tax Base

■ Federal–Mogul argues that in calculating the amount to be added to USP to adjust for the Japanese VAT, the ITA used an excessive tax base to be multiplied by the VAT rate by including profit in the base. *Federal–Mogul's Opposition* at 39–41.

The defendant and Koyo argue that the statute is silent on the issue of what tax base is to be used and that the method used by the ITA is reasonable and should be sustained. The defendant and Koyo also point out that any discrepancies

**6.** To the extent the statutory scheme may be inconsistent with the GATT, United States law controls. 19 U.S.C. § 2504(a) (1988).

caused by the use of the ITA's methodology will be eliminated by use of the COS adjustment to FMV. *Defendant's Response* at 51–53; *Koyo's Memorandum* at 32–33; *Koyo's Reply* at 38–39.

The ITA states that, in the absence of statutory guidance on this issue, the ITA looks to where in the chain of commerce the home market tax authority calculates the home market VAT and tries to use a USP at a comparable point in the chain of commerce to calculate the addition to USP. *Defendant's Response* at 52. In this case the ITA

> calculated the addition to USP by applying the HM tax rate to the net U.S. price after all other adjustments were made. This imputed tax amount is BIA, because HM sales were reported net of VAT, and we are thus unable to determine what the home market tax base was.

*Issues Appendix*, 56 Fed.Reg. at 31,729.

Since this Court has already disallowed the ITA's use of a COS adjustment to achieve tax neutrality, the ITA's choice of the correct tax base becomes very important. Federal–Mogul's problem with the ITA is that the tax base which the ITA has chosen to use in this case is the net USP including profit. Federal–Mogul believes that profit should be excluded from the tax base.

Federal–Mogul fails to cite statutory or other support for its position. It is well established that profit is correctly a part of the ITA's calculation of USP. *Timken Co. v. United States*, 11 CIT 786, 811–14, 673 F.Supp. 495, 518–21 (1987). It also makes intuitive sense that the tax base will always include the manufacturer's profit. Whether the tax base is an ex-factory price or a retail or wholesale price or some other price along the chain of commerce, the manufacturer's profit will already be in-

cluded in that price. Therefore, this Court finds that the ITA's use of the net USP including profit as the tax base is reasonable and in accordance with law.

### 2. *Calculation of Cash Deposit Rates*

■ In this administrative review, the ITA used two different methodologies for the actual calculation of the dumping margins in cases where ESP sales were used: one for assessing duties on entries covered by the review, and the other for setting the cash deposit rate on future entries of the subject merchandise. *Final Results*, 56 Fed.Reg. at 31,756–57; *Issues Appendix*, 56 Fed.Reg. at 31,698–702. To calculate the assessment rate for ESP sales, the ITA "divide[d] the total PUDD [potential uncollected dumping duties—calculated as the total difference between foreign market value and U.S. price for an exporter] for the reviewed sales by the *total entered value* of those reviewed sales...." *Issues Appendix*, 56 Fed.Reg. at 31,698–99 (emphasis added). To calculate the estimated cash deposit rate for ESP sales, the ITA "divided the total PUDD for each exporter by the *total net U.S. price* for that exporter's sales...." *Id.* at 31,699 (emphasis added).

Federal–Mogul argues that the ITA's use of a methodology which results in an estimated cash deposit rate different from the assessment duty rate was unsupported by substantial evidence on the record and not in accordance with law. *Federal–Mogul's Opposition* at 68–77. Specifically, Federal–Mogul contends that since the cash deposit rate is applied to the entered value of future entries, the ITA's policy of calculating this rate as a percentage of statutory USP rather than as a percentage of the entered value results in an under collection of cash deposits on future entries.[7] *Id.* at 68–71.

---

[7]. Federal–Mogul presents the following example of how the ITA's methodology would work:

> For example, assume Commerce reviewed only one entry of one AFB sold in an ESP transaction during the review period. Further, assume that (a) the entered value of that single AFB was $10; (b) the resale price of that AFB was $20; (c) Commerce removed the movement and U.S. selling expenses to arrive

at an ESP of $15; (d) the comparison FMV is $18, yielding a dumping margin of $3; and (e) the percentage dumping margin is, therefore, 20 percent ($3 dumping margin as a percentage of $15 statutory ESP). This percentage is what Commerce would use as a deposit rate for future entries.

> Now, assume that, on the day after this result is published in a final determination,

In order to avoid this under collection, Federal–Mogul suggests that a more accurate method for calculating the deposit rate is to represent the antidumping duty as a percentage of the entry's entered value (this is the method that the ITA used for calculating the assessment rate). *Id.* at 70–71.

Among other arguments, the defendant, Koyo Seiko and NSK contend that there is no statute or case law requiring the cash deposit rate to equal the duty assessment rate. *Defendant's Response* at 74–75; *Koyo's Memorandum* at 35–36; *NSK's Response* at 39. Moreover, the defendant and Koyo argue that the ITA is not required to use an identical methodology for computing both assessment rates and cash deposit rates. *Defendant's Response* at 74–75; *Koyo's Memorandum* at 35.

Section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675, sets out the procedures for reviewing and assessing antidumping duties for merchandise which is subject to an antidumping duty order. Section 1675(a)(2) states in relevant part:

[T]he administering authority shall determine—

. . . . .

(B) the amount if any, by which the foreign market value of each such entry exceeds the United States price of the entry.

[A]nd that determination shall be the basis ... for deposits of estimated duties. 19 U.S.C. § 1675(a)(2).

This provision does not require the ITA to use a specific denominator (entered value or USP) to calculate the cash deposit rate. In addition, the provision does not specify that the same method should be used for calculating both assessment rates and cash deposit rates.

This court has previously interpreted this provision in *Zenith Elecs. Corp. v. United States*, 15 CIT ——, ——, 770 F.Supp. 648, 654–55 (1991), and in *Daewoo Elecs. Co. v. United States*, 13 CIT 253, 282–83, 712 F.Supp. 931, 956–57 (1989).

In *Zenith*, the ITA used the same methodology for computing the cash deposit rate as it did in this case—it expressed the cash deposit rate as a percentage of the total statutory USP for each exporter's sales and applied that percentage to the entered value of future imports of the subject merchandise. The *Zenith* court rejected the plaintiff's contention that this methodology understates actual cash deposits and held that the ITA acted within its discretion and reasonably complied with 19 U.S.C. § 1675(a)(2). *Zenith*, 15 CIT at ——, 770 F.Supp. at 654–55. The court concluded that "[a]lthough this [methodology] may not be the absolutely perfect procedure for setting deposits of estimated duties, it is certainly a rational one and it can certainly be justified in terms of the purposes of the law." *Id.* at ——, 770 F.Supp. at 655.

In *Daewoo*, the court stressed that the ITA has considerable discretion in selecting a methodology to compute the cash deposit rate. 13 CIT at 283, 712 F.Supp. at 957. The *Daewoo* court concluded that the ITA's methodology of using USP as the denominator in computing the cash deposit rate and applying this rate to the entered value of future imports of the subject merchandise reasonably complied with 19 U.S.C. § 1675(a)(2). *Id.*

Federal–Mogul also asserts that although cash deposit rates are estimates of future dumping liabilities, they must be "as closely tailored to actual antidumping duties as is reasonable given data available...." *Federal–Mogul's Opposition* at 73–74 (*quoting Badger–Powhatan v. Unit-*

---

there is a new, one unit entry of this same AFB, again at an entered value of $10. Using Commerce's percentage dumping margin (20 percent) as determined in the just-completed review, the Customs Service would require a cash deposit of only $2 for an estimated antidumping duty. However, the most recent information available indicates that the future dumping margin and antidumping duty liabil-

ity on this new entry will be $3. The proper way to calculate the deposit rate is to express the just-determined antidumping duty ($3) as a percentage of the reviewed entry's entered value ($10), which would have yielded a 30 percent deposit rate and an accurate $3 cash deposit for an estimated antidumping duty on the new entry.

*Federal–Mogul's Opposition* at 70–71.

ed States, 10 CIT 241, 250, 633 F.Supp. 1364, 1373 (1986), *appeal dismissed,* 808 F.2d 823 (Fed.Cir.1986)). Federal–Mogul argues that if the ITA used the entered value percentage methodology for cash deposits, this would produce a more accurate deposit rate that would be closer to the actual assessment of antidumping duties. *Federal–Mogul's Opposition* at 70–71.

Although deposit rates must be as accurate as reasonably possible, this Court agrees with the opinion in *Zenith* that the method advocated by the plaintiff "would not necessarily result in a more accurate estimation of the duty amount that will ultimately be assessed." *Zenith,* 15 CIT at ——, 770 F.Supp. at 655.

Federal–Mogul assumes that future USP will be the same as current USP and will always be greater than entered value. These assumptions are by no means true. As the court in *Daewoo* stated:

> It would also be speculative to assume that the adjusted U.S. price of the future entries would indeed be increased in the same proportion as in the final results of this review. The statutory U.S. price is subject to various upward and downward adjustments which depend on many factors to be determined during a future review. Until the ITA conducts such a review and determines the adjusted U.S. price for the future entries, it is within Commerce's discretion to apply the rates of these final results to the entered invoice value of the future entries without any additional conversions to account for the differences between the entered value of the merchandise and the adjusted U.S. price to be determined in the future.

13 CIT at 283, 712 F.Supp. at 957.

Therefore, this Court adheres to the views previously expressed in *Zenith* and *Daewoo* that the methodology used by the ITA in this review may not be absolutely perfect, but is reasonable and in accordance with law. *Zenith,* 15 CIT at ——, 770 F.Supp. at 655; *Daewoo,* 13 CIT at 283, 712 F.Supp. at 957.

3. *Delayed Payment of Home Market Selling Expenses*

Federal–Mogul argues that, in instances where the ITA granted a respondent a COS adjustment for expenses related to sales of the subject merchandise in the home market that were made on a delayed payment basis, the ITA should be required to grant an adjustment in the amount of the expense "paid out minus the savings realized by paying that amount sometime after the obligation to pay was incurred." *Federal–Mogul's Opposition* at 53. Federal–Mogul states that the ITA addressed only discounts and rebates and not other COS adjustments when discussing Federal–Mogul's arguments on this issue in the Final Results, that the ITA's arguments in regard to discounts and rebates make no sense and that the ITA's attempts to distinguish adjustments for credit and inventory carrying costs as opposed to adjustments for other sales expenses have no support. *Id.* at 53–58.

In the Final Results, the ITA stated:

> As the Department stated in Color Television Receivers, Except Video Monitors, From Taiwan, 55 FR 47093, 47094 (1990), any savings resulting from the deferred payment of a discount or rebate would have been taken into account by the seller in setting the terms of the discount or rebate. Therefore, it is unnecessary to adjust the "actual cost" to the seller. This is in contrast to credit costs or inventory carrying costs, which are imputed costs, where the seller does not know how long it will take for a customer to pay or how long he will store merchandise before it is sold.

*Issues Appendix,* 56 Fed.Reg. at 31,718.

The defendant, Koyo and NTN argue that the above analysis "is clearly applicable also to other expenses paid in the home market because they are likely to already incorporate a factor for delayed payment." *Defendant's Response* at 56; *see also Koyo's Memorandum* at 39–40; *Koyo's Reply* at 45–47; *NTN's Reply* at 16–17. The defendant and NSK also argue that the ITA should be allowed to follow its past practice of making adjustments to FMV for

selling expenses as recorded in a respondent's financial accounts. *Defendant's Response* at 56; *NSK's Response* at 29–30.[8] The defendant also argues that it would be extremely burdensome to require the ITA to make these delayed payment adjustments and that, in fairness, these types of adjustments would also have to be made for USP selling expenses, further increasing the burden on the ITA. *Defendant's Response* at 56.

The authority for the ITA to make adjustments to FMV for home market selling expenses is codified at 19 U.S.C. § 1677b(a)(4)(B) and 19 C.F.R. § 353.56(a) (1991).[9]

As an initial matter, this Court would like to point out that the defendant's argument that quantifying COS adjustments as Federal–Mogul suggests would increase the burden imposed on the ITA is irrelevant. If this Court finds that Federal–Mogul's interpretation of the law is in fact the correct one, the ITA will simply have to meet any increased burden that the law requires. *Kansas City S.Ry. Co. v. I.C.C.,* 252 U.S. 178, 188, 40 S.Ct. 187, 189, 64 L.Ed. 517 (1920).

In the Final Results, the ITA addressed Federal–Mogul's concerns only in regard to discounts and rebates while completely failing to address Federal–Mogul's concerns about delayed payments in regard to various other COS adjustments which were made in this review. *Issues Appendix,* 56 Fed.Reg. at 31,718. The defendant now says that the argument which it presented in the Final Results in regard to discounts and rebates, *i.e.,* that when deciding on the amount of a discount or rebate a respondent has already adjusted the expense to account for any savings incurred, applies with equal force to other COS adjustments to FMV with deferred payment of other types of sales expenses. *Defendant's Response* at 55–56.

This Court is not convinced that this argument is correct. While this argument may be true for many types of deferred payments of sales expenses, it may not always be the case, and there is no evidence in the administrative record that a respondent always takes the savings due to deferred payment into account.

In addition, this type of post-hoc rationalization of the ITA's actions is unacceptable. *Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962); *Securities & Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *U.H.F.C. Co. v. United States,* 916 F.2d 689, 700 (Fed.Cir.1990).

---

**8.** In support of its position, the defendant relies on *Television Receivers, Monochrome and Color, From Japan; Final Results of Antidumping Duty Administrative Review,* 53 Fed.Reg. 4050 (1988), where, in discussing the ITA's treatment of interest payments earned on deferred payments of discounts and rebates, the ITA stated:

> Unlike situations when an expense is inherent in a transaction (e.g., credit costs when payment is delayed) yet no sales-specific quantification of such cost exists in a company's records, in this situation an allocated sales-specific cost exists in the company's records. The Department avoids imputing expenses/costs where a company quantifies the actual expenses/costs, provides adequate documentation of those expenses, and the company's quantification accurately reflects the expense to the seller.

*Id.* at 4051.

**9.** *See supra* note 4 for text of 19 U.S.C. § 1677b(a)(4)(B). 19 C.F.R. § 353.56(a) states:

> **§ 353.56 Differences in circumstances of sale.**
>
> (a) *In general.* (1) In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference. In general, the Secretary will limit allowances to those circumstances which bear a direct relationship to the sales compared.
>
> (2) Differences in circumstances of sale for which the Secretary will make reasonable allowances normally are those involving differences in commissions, credit terms, guarantees, warranties, technical assistance, and servicing. The Secretary also will make reasonable allowances for differences in selling costs (such as advertising) incurred by the producer or reseller but normally only to the extent that such costs are assumed by the producer or reseller on behalf of the purchaser from that producer or reseller.

Based on the administrative record in this case, this Court finds that the ITA's failure to address Federal–Mogul's arguments in this regard and refusal to factor in any savings attributable to the deferred payment of sales expenses when making COS adjustments to FMV was not supported by substantial evidence on the record. As a result, this Court remands this issue to the ITA to explain why, in cases where there was a deferred payment of any sales expense in the home market, COS adjustments to FMV should not be adjusted for the savings realized by paying that amount sometime after the obligation to pay was assumed. The ITA is directed to explain why any savings resulting from deferred payment of sales expenses should or should not be factored into the calculation of each type of COS adjustment made to FMV in this review.

### 4. Circumstance of Sale Adjustment to Constructed Value

Federal–Mogul alleges that the ITA made a COS adjustment to constructed value pursuant to 19 U.S.C. § 1677b(a)(4)(B) which removed more in selling expenses than had originally been included in the calculation of constructed value in the first place. *Federal–Mogul's Opposition* at 58–60. Federal–Mogul presents *no* evidence that the ITA has in fact done so. Therefore, this Court need not reach this issue. *See Asociacion Colombiana de Exportadores v. United States*, 13 CIT 13, 19 n. 8, 704 F.Supp. 1114, 1120 n. 8 (1989), *aff'd on other grounds*, 901 F.2d 1089 (Fed.Cir. 1990), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990).

### 5. Commission Offset Adjustment to FMV

▆ Federal–Mogul challenges the ITA's implementation of 19 C.F.R. § 353.56(b)(1)

(1991) [10] which sets out a special rule allowing an adjustment to FMV when a respondent pays sales commissions on sales in the United States but pays no commissions on sales in the home market. Under such circumstances, the ITA will make an adjustment to FMV for home market indirect selling expenses up to the level of the commission expense removed from USP.

Federal–Mogul challenges the manner in which the ITA quantifies this adjustment to FMV in cases where FMV is compared to ESP. Specifically, Federal–Mogul believes that the ITA's method double-counts the portion of the U.S. commission which covers directly related selling expenses which have already been adjusted for in the home market pursuant to 19 C.F.R. § 353.-56(a).[11] In other words, Federal–Mogul alleges that the ITA fails to break out the direct and indirect components of the U.S. commissions on ESP sales and adjust FMV only up to the amount of the indirect component. As a result, when the ITA deducts the full amount of the U.S. commission from FMV indirect expenses, the ITA is adjusting for direct expenses such as advertising which it has already adjusted for. *Federal–Mogul's Opposition* at 78–79. Federal–Mogul also argues that Koyo does not have standing to raise this issue since Federal–Mogul alleges that Koyo paid sales commissions on all sales in the home market. *Id.* at 76–77.

However, Koyo did not pay sales commissions on all of its sales in the home market, was eligible for the commission offset in regard to some home market sales and therefore has standing to raise this issue here. Administrative Record Japan Public Document 340.

Federal–Mogul relies on an excerpt from the House of Representatives Committee on Ways and Means Report on the Trade Agreements Act of 1979. H.R.Rep. No.

---

**10.** 19 C.F.R. § 353.56(b)(1) states:
(b) *Special Rule.* (1) Notwithstanding paragraph (a), the Secretary normally will make a reasonable allowance for other selling expenses if the Secretary makes a reasonable allowance for commissions in one of the markets under consideration and no commission is paid in the other market under consider-

ation, but the Secretary will limit the amount of such allowance to the amount of the other selling expenses incurred in the one market or the commissions allowed in the other market, whichever is less.

**11.** *See supra* note 9 for text of 19 C.F.R. § 353.-56(a).

317, 96th Cong., 1st Sess. 76 (1979), U.S.Code Cong. & Admin.News 1979, 381. However, this excerpt refers to circumstances of sale adjustments codified at 19 U.S.C. § 1677b(a)(4)(B) and 19 C.F.R. § 353.56(a) and not to the commission offset codified at 19 C.F.R. § 353.56(b)(1) which is at issue in this case.[12]

As an initial matter, the Court notes that there is no basis in the statute or the regulations for requiring the ITA to break out the direct and indirect components of U.S. commissions on ESP sales and adjust FMV indirect expenses only up to the amount of the indirect component of the U.S. commission.

In addition, it has been the ITA's consistent practice to treat the offset for sales commissions in only one market in the manner it has in this case. *See, e.g., Final Results of Anti-dumping Duty Administrative Review and Revocation in Part: Titanium Sponge From Japan,* 57 Fed. Reg. 557, 558 (1992); *Final Results of Antidumping Duty Administrative Review; Certain Fresh Cut Flowers From Mexico,* 56 Fed.Reg. 1,794, 1,796–97 (1991); *Final Determination of Sales at Less Than Fair Value; Industrial Nitrocellulose from the United Kingdom,* 55 Fed.Reg. 21,055, 21,056 (1990).

Finally, Federal–Mogul makes no reference to the administrative record to show that the double-counting which it has alleged resulted from the ITA's treatment of the commission offset for U.S. sales commissions has in fact occurred.

Given these circumstances, this Court finds that in the absence of explicit statutory guidance, the ITA's interpretation of the statue it is charged with administering

should be given deference. *Melamine Chems., Inc. v. United States,* 732 F.2d 924, 928 (Fed.Cir.1984). Therefore, this Court affirms the ITA's adjustment to FMV for U.S. sales commissions paid on ESP sales.

### 6. *Antidumping Duty Legal Expenses*

██ Federal–Mogul argues that 19 U.S.C. § 1677a(e)(2) (1988) requires the ITA to deduct respondent's antidumping duty related legal fees from ESP as "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." Federal–Mogul also argues that this court's holdings in *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 269–70, 712 F.Supp. 931, 947 (1989), and *Zenith Elecs. Corp. v. United States,* 15 CIT ——, ——, 770 F.Supp. 648, 651 (1991), were wrongly decided. *Federal–Mogul's Opposition* at 61–65.

Here Federal–Mogul raises an issue which has been previously decided by this court. In *Daewoo,* the court stated

that legal fees do not qualify as selling expenses, and that it would also be against public policy to make an adjustment for legal fees in calculations of dumping margins. Such practice would create artificial dumping margins and might encourage frivolous claims in order to incur legal fees which would result in increased margins.

13 CIT at 270, 712 F.Supp. at 947.

In *Zenith,* the court stated:

The fundamental reason for not allowing the [deduction] of legal expenses which are related to antidumping proceedings is that the expenses of a party's partic-

---

**12.** The House Report states:

Regulations will establish groups of adjustments based on types of adjustments currently recognized, that is, differences in circumstances of sale (e.g. credit terms, warranties, differences in the level of trade, and assumption by a seller of a purchaser's advertising or selling costs and commissions), quantities sold, and differences in the merchandise compared.

Such adjustments to the price of similar merchandise sold in the exporter's home market or third country markets are appropriate

in determining FMV. However, if adjustments are improperly made, the result may be an unjustifiable reduction in or elimination of the dumping margin. Therefore, the Committee intends that adjustments should be permitted if they are reasonably identifiable, quantifiable, and directly related to the sales under consideration and if there is clear and reasonable evidence of their existence and amount. H.R.Rep. No. 317 at 76.

This excerpt clearly does not pertain to the commission offset, currently codified at 19 C.F.R. § 353.56(b)(1).

ipation in legal proceedings provided by law should not become an element in the decision of those selfsame proceedings. 15 CIT at ——, 770 F.Supp. at 651.

This Court completely agrees with the decisions of the *Daewoo* and *Zenith* courts and adopts their reasoning. In addition, the Court warns plaintiff that its repeated raising of this issue in the face of the clear contrary holdings of this Court risks the imposition of sanctions for the raising of frivolous claims.

### 7. *Deduction of Antidumping Duties from USP*

■■■ Federal–Mogul argues that 19 U.S.C. § 1677a(d)(2)(A) (1988) requires the ITA to deduct cash deposits of estimated antidumping duties made by respondents during the period of review. 19 U.S.C. § 1677a(d)(2)(A) states that the ITA must deduct from USP

the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, *and United States import duties,* incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States

. . . .

(Emphasis added).

ITA argues that 19 U.S.C. § 1677a(d)(2)(A) requires the deduction of normal import duties and that cash deposits of estimated antidumping duties are not normal import duties, that deposits of estimated antidumping duties are not selling expenses that should be deducted and that not deducting estimated antidumping duties from USP has been the ITA's consistent administrative practice. *Defendant's Response* at 68–71. Koyo agrees with the ITA's arguments. *Koyo's Memorandum* at 51.

ITA relies on this court's holding in *PQ Corp. v. United States,* 11 CIT 53, 65–68, 652 F.Supp. 724, 735–37 (1987). The court in *PQ Corp.* stated that the

ITA has been careful in its implementation of the [Tariff Act of 1930] not to allow the amount of estimated antidumping duties, based upon *past* dumping

margins, to alter its determination of *present* dumping margins. If deposits of estimated antidumping duties entered into the calculation of present dumping margins, then those deposits would work to open up a margin where none otherwise exists.

11 CIT at 67, 652 F.Supp. at 737 (emphasis in original).

Federal–Mogul argues that the court wrongly decided *PQ Corp.* because the amounts which the ITA does deduct from USP are *deposits* of estimated normal import duties because liquidation has not yet occurred. *Federal–Mogul's Memorandum* at 66 n. 36.

ITA counters that the deposits of estimated normal import duties which the ITA deducts from USP are based upon rates published in the Harmonized Tariff Schedule and the actual entered value of the merchandise. Therefore, the actual amount to be assessed upon liquidation of normal import duties is known and is equal to the amount of estimated normal duties deposited and used by the ITA to calculate the dumping margin. In contrast, deposits of estimated antidumping duties are based on past dumping margins and may bear little relation to the actual current dumping margin. *Defendant's Response* at 70–71.

This Court finds the reasoning of the court in *PQ Corp.* and the ITA's distinction between the treatment of deposits of estimated normal import duties and the treatment of deposits of estimated antidumping duties to be persuasive. The Court finds that 19 U.S.C. § 1677a(d)(2)(A) requires the ITA to deduct estimated import duties from USP only to the extent that the actual duties to be collected can be determined at the time the ITA is calculating the current dumping margins. Therefore, the ITA was correct to deduct from USP only deposits of the actual normal import duties owed which can be accurately determined, and the ITA was correct not to deduct cash deposits of estimated antidumping duties, which may not bear any relationship to the actual dumping duties owed, from USP.

## Conclusion

In accordance with the foregoing opinion, this case is remanded to the ITA to examine the administrative record to determine the exact monetary amount of VAT paid on each sale in the home market and make sure that the amount added to the comparable USP sale pursuant to 19 U.S.C. § 1677a(d)(1)(C) is less than or equal to this amount, to add the full amount of VAT paid in the home market to FMV without adjustment and to explain why any savings resulting from deferred payment of sales expenses should or should not be factored into the calculation of each type of COS adjustment made to FMV in this review. ITA's determination is affirmed in all other respects. Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.

## ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

ORDERED that defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.'s motion for partial judgment on the agency record is granted in part and this case is remanded to the Department of Commerce, International Trade Administration ("ITA"), to examine the administrative record to determine the exact monetary amount of VAT paid on each sale in the home market and make sure that the amount added to the comparable USP sale pursuant to 19 U.S.C. § 1677a(d)(1)(C) is less than or equal to this amount, to add the full amount of VAT paid in the home market to FMV without adjustment and to explain why any savings resulting from deferred payment of sales expenses should or should not be factored into the calculation of each type of COS adjustment made to FMV in this review; and it is further

ORDERED that the ITA's determination is affirmed in all other respects; and it is further

ORDERED that the remand results are due within ninety (90) days of the date this opinion is entered; comments or responses by the parties to the remand results are due within thirty (30) days thereafter; and any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.

